ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
*Bid Protest*

FILED

JUL 2 3 2009

U.S. COURT OF
FEDERAL CLAIMS

| | |
|---|---|
| PLANETSPACE INC.<br>39 South LaSalle<br>Suite 600<br>Chicago, IL 60603 | )<br>)<br>)<br>) |
|     Plaintiff, | )<br>) |
|     v. | )<br>) |
| UNITED STATES OF AMERICA | )<br>) |
| SERVE:<br>    Attorney in Charge of Litigation<br>    U.S. Department of Justice<br>    Civil Division<br>    Commercial Litigation Branch<br>    1100 L St., N.W., 8th Floor<br>    Washington, D.C. 20530 | )<br>)<br>)<br>)<br>)<br>)<br>) |
|     Defendant. | )<br>) |

No._____

09 - 476 C

# COMPLAINT

## I.    NATURE OF THE ACTION

1.    This is a post-award bid protest in which plaintiff PlanetSpace Inc. challenges, and seeks injunctive relief with respect to, NASA's award of two 6-year contracts, each with a minimum value of over $1.5 billion, for commercial resupply services to the International Space Station. NASA awarded the contracts to two other entities, notwithstanding the fact that PlanetSpace in its proposal has teamed with the free world's two largest and most successful purveyors of comprehensive space services, Lockheed Martin and Boeing, and unlike its competitors, proposes to use proven technology with a long history of successful launches and mission accomplishments; and notwithstanding the fact that NASA's Source Evaluation Board

had rated PlanetSpace higher than one of its competitors on *both* evaluation criteria, Mission Suitability and Price.

      2.    As detailed in this complaint, NASA's failure to award one of the two contracts to PlanetSpace was arbitrary and capricious, and a violation of law and regulation, in six independent respects:

- Notwithstanding the high ratings given the PlanetSpace proposal by NASA's own Source Evaluation Board, a group of experts from disciplines ranging from financial analysis to complex program management, the Source Selection Authority made a *de facto* finding of "non responsibility," *i.e.*, that PlanetSpace lacked the financial, technical or managerial ability to perform the contract. However, given that PlanetSpace is a small business, the Source Selection Authority had no legal authority to make such a finding, but was required by law and regulation to refer the question of PlanetSpace's responsibility to the Small Business Administration, whose decisions on that question are binding on all federal agencies, and which frequently finds "responsible" entities whose responsibility had been challenged by the procuring federal agency.

- Even assuming that the Source Selection Authority properly changed the Source Evaluation Board ratings so as to rate PlanetSpace lower than both competitors with respect to Mission Suitability, the Source Selection Authority was required as a matter of law and regulation to conduct a "trade off analysis" to determine whether PlanetSpace's proposal, which was at a price substantially less

than one of the competitors, presented the best value to the government. The Source Selection Authority's failure to do so was unlawful.

- The Source Selection Authority unlawfully based his decision on criteria that were not specified in the Request for Proposals.

- The Source Selection Authority failed to conduct the procurement on an equal basis, by failing to credit PlanetSpace for significant strengths on the basis of the same factors for which it credited one of its competitors.

- NASA awarded one of the contracts to an offeror that proposes to use a foreign made launch vehicle, without, on information and belief, having obtained the requisite approval of the Director of the Office of Science and Technology Policy.

- The Source Selection Authority's decision was irrational in its analysis of PlanetSpace's method for paying its subcontractors.

## II.    JURISDICTION

3.      This Court has jurisdiction over this bid protest action pursuant to 28 U.S.C. § 1491(b).

4.      Plaintiff PlanetSpace indisputably submitted a fully compliant proposal in response to the Request for Proposals, but was eliminated in final selection. Accordingly, PlanetSpace has standing to sue as an interested party, pursuant to 28 U.S. C. § 1491(b).

## III.    THE PARTIES

5.      Plaintiff PlanetSpace Inc. is a corporation with its principal place of business in Chicago, Illinois. PlanetSpace submitted a timely and fully responsive proposal in response to the Request for Proposals. PlanetSpace's proposal was not selected for award.

6.     Defendant is the United States of America, acting by and through its agency, NASA. NASA is an Executive Agency of the United States government, and was the agency involved in the procurement described in this bid protest complaint.

## IV.     FACTS

### A.     The NASA Request For Proposals To Delver Cargo To And From The International Space Station.

7.     The International Space Station is a scientific research facility residing in low earth orbit. The International Space Station is a joint project among the space agencies of the United States, Russia, Japan, Canada and the European Space Agency.

8.     NASA's fleet of three Space Shuttles currently provides the bulk of NASA's cargo space transportation needs to and from the International Space Station. However, NASA intends to end the Space Shuttle program in 2010, and its planned long-term replacement for the Space Shuttle, the Ares rocket lift system and Orion spacecraft, is unlikely to be ready for launch until perhaps 2015.

9.     NASA has sought to fill, in part, its launch and cargo transportation needs during the post-Space Shuttle, pre-Ares/Orion period by contracting for delivery services with its Russian, European, and Japanese partners. However, these international partners do not have the capacity to meet all delivery needs created by the Space Shuttle's retirement, in part because of the lead times for launch vehicles and spacecraft. In addition, the international partners may not have sufficient additional capacity because of previous commitments to other customers for launch services (*e.g.*, commercial satellites). Furthermore, additional reliance upon Russian resources presents domestic political concerns and subjects supply needs to unpredictable changes in international relationships.

4

10.    Accordingly, NASA determined to look to the U.S. commercial space industry to address the need to resupply the International Space Station through at least 2015. It issued Request for Proposals No. NNJ08ZBG001R, seeking proposals for the award of firm, fixed price, "indefinite delivery indefinite quantity" contracts to supply cargo to and return cargo from the International Space Station, using U.S.-built launch and cargo vehicles. An "indefinite delivery indefinite quantity" contract is one under which the contractor is obligated to provide the specified goods or services as the need arises. The contract may (as here) provide a general timeframe for services and a minimum amount that the contractor will be called upon to deliver.

11.    NASA issued Request for Proposals No. NNJ08ZBG001R on April 14, 2008. The Final Request for Proposals was issued on June 17, 2008.

12.    The Request for Proposals called for offerors to provide detailed plans and prices for the provision of three different types of space transportation services:  (1) transport of cargo to the International Space Station; (2) disposal of unneeded cargo from the International Space Station; and (3) return of cargo from the International Space Station to NASA.  The Request for Proposals' Statement of Work stated that, depending on specific mission objectives, delivery to the International Space Station may require that cargo be transported in pressurized or unpressurized equipment, and may also require any combination of delivery, disposal and/or return of cargo in a single mission.

13.    The Request for Proposals contained three contract line items ("CLIN"): CLIN 0001 Standard Resupply Services; CLIN 002 Non-Standard Services; and CLIN 0003 Special Task Assignments and Studies.  CLIN 0001 was further divided into four sub-CLINs: CLIN0001AA Pressurized Upmass (*i.e.*, space transportation services to the International Space Station in a pressurized cargo container); CLIN0001AB Unpressurized Upmass (*i.e.*, space

5

transportation services to the International Space Station in an unpressurized cargo container); CLIN0001AC Return Cargo Downmass (*i.e.*, space transportation services from the International Space Station to NASA); and CLIN0001AD Disposal Cargo Downmass (*i.e.*, space transportation services from the International Space Station with subsequent disposal of cargo). Offerors were to provide a price per kilogram of mass transported under each sub CLIN for each calendar year of contract performance. Offerors were to provide a fixed price for each of 13 different services described in CLIN002 per calendar year, and composite labor rates per calendar year for services ordered under CLIN003.

14.     The Request for Proposals contemplated the award of one or more fixed price, Indefinite Delivery Indefinite Quantity contracts, each having a maximum value of $3.1 billion.

15.     The Request for Proposals stated that proposals would be evaluated using two overarching factors: Mission Suitability and Price. The two factors would be compared across proposals to determine which proposal or proposals presented the "best value" to the government. The Request for Proposals provided that Mission Suitability was more important than Price.

16.     The Mission Suitability factor comprised three subfactors: (1) Subfactor A (Technical Approach); (2) Subfactor B (Management Approach); and (3) Small Business Utilization.

17.     Subfactor A (Technical Approach) was used to assess several elements: System Capabilities and Summary of Performance, International Space Station Integration and Demonstration, International Space Station Resupply Mission Performance Plan, and Risks.

18.    Subfactor B (Management Approach) was used to assess other elements: Company Information, Performance Milestones, and Safety and Mission Assurance.

19.    Subfactor C (Small Business Utilization) was used to assess a proposal's subcontracting goals for small businesses.

20.    The Mission Suitability factor was scored on a scale of 1000 maximum points, as follows:

|  |  | Points |
|---|---|---|
| Subfactor A – | Technical Approach | 550 |
| Subfactor B – | Management Plan | 400 |
| Subfactor C – | Small Business Utilization | 50 |
|  | Small Business | 25 |
|  | Small Disadvantaged Business | 25 |
| TOTAL |  | 1000 |

21.    Point totals for each Subfactor were also converted into percentage scores, and assigned corresponding adjectival ratings of either Excellent, Very Good, Good, Fair, or Poor.    The evaluators also assigned "significant strength," "strength," "weakness," or "significant weakness" to each element of each Subfactor.

22.    The Request for Proposals stated that an offeror's past performance would be evaluated as part of each Mission Suitability Subfactor, but that it would not be separately scored. The Request for Proposals stated that the past performance of proposed subcontractors would be considered in the past performance evaluation. The Request for Proposals further stated that if an offeror did not have a relevant past performance record, the offeror would not be evaluated either favorably or unfavorably on past performance.

23.    During the procurement process, NASA stated that the National Space Transportation Policy, dated December 21, 2004, would apply to the contract. The National Space Transportation Policy provides that "United States Government payloads shall be

7

launched on space launch vehicles manufactured in the United States, unless exempted by the Director of the Office of Science and Technology Policy, in consultation with the Assistant to the President for National Security Affairs."

24.     Proposals were evaluated by a NASA Source Evaluation Board. The Source Evaluation Board serves to "provid[e] expert analyses of the offerors' proposals in relation to the evaluation factors and subfactors contained in the solicitation." NASA FAR Supplement, § 1815.370(b). The NASA Source Evaluation Board is staffed with "individuals fully qualified to identify the strengths, weaknesses, and risks associated with proposals submitted in response to the solicitation." NASA FAR Supplement, § 1815.370(c)(1).

25.     The Source Evaluation Board here included a Manager from the Johnson Space Center Management Systems Office; the NASA Contracting Officer for the procurement; the division manager for the NASA Johnson Space Center; a NASA lead pricing analyst; a NASA technical lead; a NASA launch services program representative; a NASA program management lead; a NASA International Space Station program representative; and a NASA senior Safety & Mission Assurance representative.

26.     The Source Evaluation Board is a fact-finding and deliberative body, and may include committees assigned to investigate and evaluate individual elements of each proposal against Request for Proposals criteria. Proposals were to be scored and ranked by the Source Evaluation Board. Offerors were to be given the opportunity to address identified deficiencies through oral and written discussions with the Source Evaluation Board, and to submit a final revised proposal. Final proposal ratings and rankings are made after Source Evaluation Board members "thoroughly review each proposal and any committee reports and

findings." NASA FAR Supplement § 1815.370(g)(4). After this review, voting members of the Source Evaluation Board vote on final scores for proposals.

27.     NASA received five offers in response to the Request for Proposals. Three of these offers were deemed to be fully respondent, the offers submitted by plaintiff PlanetSpace, Space Exploration Technologies Corporation ("Space-X"), and Orbital Sciences Corporation ("Orbital").

28.     Each of the three offerors' proposals was formally found to be within the "competitive range for selection." The competitive range for selection is "comprised of all of the most highly rated proposals." FAR § 15.306(c). On September 8, 2008, NASA notified PlanetSpace that it has been included in the competitive range. The notice requested that PlanetSpace provide written responses to several questions, including price clarifications, weaknesses and non-compliance findings, and model contract clarifications.

29.     On October 1, 2008, PlanetSpace participated in oral discussions with the Source Evaluation Board. During the discussions, the Source Evaluation Board identified areas of weakness and significant weaknesses in PlanetSpace's proposal. PlanetSpace made several enhancements to its proposal in order to address the identified weaknesses. These enhancements were memorialized in PlanetSpace's Final Revised Proposal.

**B.     The Offerors**

30.     One of the three offerors, Space-X, was founded in 2002 and based in Los Angeles California. Upon information and belief, Space-X relies primarily on in-house development for its launch and space transport systems. Space-X's proposal was largely premised on developing its liquid fueled Falcon 1 rocket booster into a proposed, much larger and more complex launch vehicle, called the Falcon 9. The Falcon 1 launch system has itself

9

failed on three of the five launch attempts Space-X has undertaken. These failures include its third attempt on August 2, 2008, and its second attempt on March 24, 2006.

31.     The proposed Falcon 9 would be a much more complex system than the Falcon 1, intended to carry twenty-two times more cargo. In order to achieve this cargo lift capability, Space-X has designed the Falcon 9 to use nine of the Merlin 1C rocket motors used in the unreliable Falcon 1, which itself uses only a single rocket motor, and the same avionics as the Falcon 1, but combined with a fuselage that is 110 meters longer, seven feet wider, approximately 600,000 lbs heavier, and having 800,000 pounds more thrust.

32.     Space-X has been developing the Falcon 9 launch vehicle and Dragon spacecraft, both of which it proposes to use in the International Space Station resupply contract, as part of a separate agreement with NASA -- a $278 million Commercial Orbital Transportation Services agreement. Of this $278 million, Space-X has been paid $234 million, and has yet to make a flight of the proposed system. Upon information and belief, Space-X is now more than 18 months behind its original Commercial Orbital Transportation Services schedule with respect to the readiness review for its demonstration flight. Only $44 million in milestone payments remains on its Commercial Orbital Transportation Services agreement, and no more money is due until its first actual Falcon 9 demonstration flight. This demonstration flight was originally set for September 2008, then re-set for March 2009, but now is not scheduled to take place until late 2009, at the earliest.

33.     Orbital was the second bidder. Orbital proposed to develop a new launch system based on its existing Taurus I rocket booster. Orbital's Taurus I rocket booster has flown successfully on 6 of 8 attempts, but has failed on 2 of its last 3 attempts, including a launch on February 24, 2009, which destroyed NASA's $273.4 million Orbiting Carbon Observatory.

Upon information and belief, the new system, the Taurus II, will be substantially different than the Taurus I. The Taurus II will need to be some 40 feet longer, 5 feet wider, 250,000 pounds heavier, and have twice the thrust. Most significantly, the Taurus II would have a large, liquid fueled rocket stage, and it will use two modified 33-year old Russian-made engines. Upon information and belief, Orbital has little liquid fueled rocket experience, and the Taurus II will be Orbital's first liquid fueled launch system intended to launch payloads in to Earth orbit. In addition, much of the development work for the Taurus II, and the proposed space transport vehicle, the Cygnus, will be done in Italy by Alenia, and the propellant tanks will be developed and manufactured by Orbital's Ukrainian subcontractor Yuzhnoye/Yuzmash.

34.     Plaintiff PlanetSpace was the third offeror determined by NASA to be in the competitive range. PlanetSpace's proposal set forth a "teaming approach" to providing International Space Station resupply services. PlanetSpace proposed to retain contract and financial management tasks for itself, and to subcontract design, development, production, and operation of space services to subcontractors that are indisputably among the most highly experienced aerospace companies in the world. PlanetSpace's proposal included the following subcontractors:

- **Lockheed Martin Space Systems Company.** Lockheed Martin, in a joint venture with Boeing, currently manages the Space Shuttle program. In a second joint venture with Boeing, Lockheed Martin provides Atlas and Delta rocket launch services for the U.S. Government, including satellites for the Department of Defense, the National Oceanic and Atmospheric Administration, and the National Reconnaissance Office; satellites, exploration vehicles, and probes for NASA; and numerous commercial missions for the launch of

11

telecommunications satellites. Atlas and Delta rocket systems have a better than 95% success rate over 210 launches. The Atlas family of rockets alone has launched successfully 85 times, and includes the Atlas V, a launch vehicle PlanetSpace proposes to use for the first International Space Station resupply mission in 2011. Under the PlanetSpace proposal, Lockheed Martin is responsible for technical and logistical aspects of the program, and with leading the development, production, and operation of the spacecraft that would be used to transport cargo to the International Space Station, the Orbital Transfer Vehicle.

- **Alliant Techsystems, Inc. (ATK).** ATK provides rocket engines and launch vehicles for both commercial and government customers. ATK rockets are currently used in the Space Shuttle program; in Delta launch vehicles (used to launch numerous satellites for U.S. Government customers, including the bulk of NASA's recent Mars missions) in Atlas II launch vehicles (formerly used to launch the Defense Satellite Communications System, the system which provides communication for US military operations around the world); and in NASA's forthcoming Ares I crew launch vehicle and Ares V cargo Launch vehicle (NASA's replacement for the Space Shuttle and to be used for future lunar missions). Under the PlanetSpace proposal, ATK is responsible for developing and providing the proposed Athena III launch vehicle and ground operations.

- **The Boeing Company.** Boeing is the current prime contractor to NASA for the International Space Station, and is responsible for the design, development, construction, and integration of the International Space Station. Under the PlanetSpace proposal, Boeing is responsible for cargo carrier

development, cargo integration services, and International Space Station integration operations support.

35.     PlanetSpace proposes to provide an entirely U.S.-made launch vehicle, the Athena III, and Orbital Transfer Vehicle. The Athena III is based on the Athena I and II launch vehicles that were used successfully by NASA in the 1990's and early 2000's. The Athena family of launch vehicles has flown successfully five times, and was subsequently designed by Lockheed Martin to be expanded to the proposed Athena III configuration, by simply replacing the first stage solid rocket motor with a derivative of the Space Shuttle Reusable Solid Rocket Motor used in all Space Shuttle missions. Unlike the Taurus II and Falcon 9 launch vehicles proposed by its competitors, the Athena III utilizes both 100% US produced rocket motors and a derivative of the highly reliable Space Shuttle Reusable Solid Rocket Motor developed for NASA by ATK.

## C.     The Source Evaluation Board Ratings.

36.     The Source Evaluation Board rated Space-X's proposal the highest for Mission Suitability with 877 points, with PlanetSpace rated second with 827 points, and Orbital third with 798 points. All three proposals received "Very Good" rankings for overall Mission Suitability. All three proposals received "Very Good" rankings for each Mission Suitability Subfactor, except Orbital received a "Good" ranking for Small Business Utilization.

37.     Space-X was the lowest price offeror, with PlanetSpace ranked the second lowest, and Orbital the highest price.

38.     Thus, PlanetSpace was rated superior to Orbital with respect to both Mission Suitability and Price. Indeed, PlanetSpace's bid price was substantially lower than Orbital's bid, with respect to the services eventually awarded to Orbital.

39.    Moreover, as discussed in ¶¶ 30-31 *supra*, while Space-X's proposal was ranked higher for Mission Suitability than PlanetSpace's proposal, the fact remained that Space-X is a new company with very limited launch success, and nothing on the scale proposed for International Space Station resupply, and lacks an experienced subcontractor team to assist in the development of its launch vehicles and spacecraft. Instead, Space-X will rely largely on its in-house "expertise."

40.    The Source Evaluation Board found all of the final proposals to have significant strengths, strengths, and weaknesses. The Source Evaluation Board did not find any final proposal to have significant weaknesses.

41.    PlanetSpace received three significant strengths, four strengths, three weaknesses, no significant weaknesses, and no deficiencies on the Technical Approach subfactor of the Mission Suitability Evaluation Factor. PlanetSpace received its significant strengths in three of four technical approach subfactors, including for past performance of PlanetSpace's key personnel and subcontractors.

42.    PlanetSpace received three significant strengths, four strengths, five weaknesses, no significant weaknesses, and no deficiencies on the Management Approach subfactor of the Mission Suitability Evaluation Factor. PlanetSpace received its significant strengths in two subfactors, including Company Information for its past performance and for using "sound teaming arrangements" with highly relevant, expert companies.

43.    PlanetSpace thus received a total of six (6) significant strengths, eight (8) strengths, and eight (8) weaknesses. Space-X's proposal was found to have a total of four (4) significant strengths, sixteen (16) strengths, and two (2) weaknesses. Orbital's proposal was found have a total of four (4) significant strengths, eight (8) strengths, and five (5) weaknesses.

14

44.     The Source Evaluation Board's assignment of PlanetSpace's proposal showed that it was superior to all other proposals with respect to significant strengths, and second only to Space-X's proposal in strengths.

### D.     The Source Selection Authority Decision

45.     Under NASA procedures, the final source selection decision is made by the Source Selection Authority.   After approximately three months of investigation and consideration, the Source Evaluation Board provided the evaluations summarized above to the Source Selection Authority during an in-person briefing on December 15, 2008.  The Source Selection Authority issued his written selection decision eight days later, on December 23, 2008. PlanetSpace was notified that it was not selected for award, and that NASA had instead awarded contracts to Space-X and Orbital.

## COUNT I - FAILURE TO REFER TO THE SMALL BUSINESS ADMINISTRATION, FOR ITS BINDING DETERMINATION, THE QUESTION OF PLANETSPACE'S "RESPONSIBILITY" OR "NONRESPONSIBILITY"

46.     PlanetSpace herein incorporates by reference the allegations set forth in paragraphs 1-45 above.

47.     The term "responsibility" refers to a firm's apparent ability and capacity to perform contract requirements. *See Fabritech, Inc.*, B-298247; B-298247.2 at 3 (2006).  The Federal Acquisition Regulations provide seven criteria that must be present in order for a contractor to be found responsible. *See generally* FAR § 9.1. Four of these criteria are relevant here: contractors must 1) "[h]ave adequate financial resources to perform the contract, or the ability to obtain them," 2) "[h]ave a satisfactory performance record," 3) "[h]ave the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them," and (4) "[h]ave the necessary production, construction, and technical equipment and facilities, or the ability to obtain them."  FAR § 9.104-1(a), (c), (e), and (f).

48.     Despite the Source Evaluation Board's rating of PlanetSpace's proposal as second overall, with the same "very good" rating on all subfactors as top rated offeror Space-X, the Source Selection Authority rejected PlanetSpace, stating that he found PlanetSpace's likelihood of performance to be "remote."

49.     In particular, the Source Selection Authority based his conclusion on, *inter alia*, PlanetSpace's supposed lack of prior performance record, *cf.* FAR § 9.104-1(c), its supposed inability to obtain adequate financial resources, *cf.* FAR § 9.104-1(a), and its supposed lack of necessary technical skills, *cf.* FAR § 9.104-1(e) and (f).

50.     Specifically,

• While the Source Evaluation Board found PlanetSpace to have significant strengths with respect to past performance and technical skills, largely because of PlanetSpace's plan to team with Lockheed Martin, Boeing, and ATK, and that these strengths would "greatly enhance the likelihood of successful performance," the Source Selection Authority disregarded these findings, stating instead that these arrangements were irrelevant because of the lack of a "corresponding strength" at the prime contractor level. This constituted a finding that PlanetSpace purportedly lacked "a satisfactory performance record," FAR § 9.104-1(c), and did not "[h]ave the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them," FAR § 9.104-1(e).

• The Source Selection Authority disregarded PlanetSpace's past performance rating as assessed by the Source Evaluation Board, stating that it was "not relevant for purposes of selection" because PlanetSpace itself did not have experience in "development, production, and operation of large, complex space

16

systems." This constituted a finding that PlanetSpace purportedly lacked "a satisfactory performance record," FAR § 9.104-1(c), and did not "[h]ave the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them," FAR § 9.104-1(e).

- The Source Selection Authority disregarded the Source Evaluation Board's rating of PlanetSpace's technical skill, stating that "I did not believe these findings should be discriminators for selection when almost all of the technical expertise appeared to reside at the subcontractor level." This constituted a finding that PlanetSpace purportedly lacked "the necessary...technical skills, or the ability to obtain them," FAR § 9.104-1(e), and "the necessary production, construction, and technical equipment and facilities, or the ability to obtain them." FAR § 9.104-(f).

- The Source Selection Authority stated "I questioned whether PlanetSpace could successfully manage much larger subcontractors responsible for the majority of the performance under the contract." This constituted a finding that PlanetSpace purportedly lacked "the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them," FAR § 9.104-1(e).

- The Source Selection Authority summed up his findings by stating: "I concluded the considerable risk inherent in PlanetSpace's management approach made the likelihood of successful performance remote." This purported finding went directly to PlanetSpace's "responsibility," which as noted in ¶ 47 *supra* refers to a firm's apparent ability and capacity to perform contract requirements. *Fabritech, Inc.*, B-298247; B-298247.2 at 3 (2006).

51.     Where, as here, the reasons given for an agency's rejection "relate directly to the protester's ability or capability to perform," such a rejection is a *de facto* determination of nonresponsibility. *Id.* at 4.

52.     The administrative record, fairly read, rebuts each of the foregoing conclusions of the Source Selection Authority. But for purposes of Count 1 of this Complaint, the salient consideration is that the Source Selection Authority simply lacked the legal authority to make the responsibility determinations he made.

53.     Source selection officials may not reject a small business concern's offer that would otherwise be accepted because of a determination of nonresponsibility. Instead, the source selection official must refer the matter to the Small Business Administration for a final responsibility determination.

54.     If the Small Business Administration determines that the small business concern is responsible, it issues a Certificate of Compliance in accordance with FAR part 19.6. If the Small Business Administration issues such a Certificate of Compliance, the source selection official must find the contractor responsible, and thus, entitled to the award. *See* FAR § 19.602.

55.     This referral process is a critical element in Congress's efforts to assist small businesses to enter the federal government procurement arena, and receive a fair opportunity to compete for and receive government contracts. This policy is so important to fair participation by small businesses in government procurement that neither the Small Business Administration nor the procuring agency may create exceptions to the statutory requirement for referral of responsibility determinations to the Small Business Administration for consideration under the Certificate of Competency program. 15 U.S.C. § 637(b)(7).

56.     The Small Business Administration frequently finds "responsible" entities whose responsibility had been challenged by the procuring federal agency.

57.     PlanetSpace is a small business.

58.     NASA did not refer the matter to the Small Business Administration.

59.     NASA's failure to comply with the Small Business Administration referral statute and regulations denied PlanetSpace the full and impartial consideration to which it was entitled in the bid evaluation process.

60.     NASA acted arbitrarily and capriciously, and contrary to law and regulation, in disqualifying PlanetSpace from consideration for award on nonresponsibility grounds without referring the matter to the Small Business Administration for final resolution of the issue in accordance with FAR parts 19.6 and 9.104.

61.     Because PlanetSpace's proposal had a higher Mission Suitability Score and lower Price than the Orbital proposal, PlanetSpace would have been awarded the contract but for the Source Selection Authority's *de facto* nonresponsibility determination. Accordingly, PlanetSpace was prejudiced by the Source Selection Authority's failure to follow proper selection procedures.

## COUNT II - FAILURE TO ENGAGE IN THE LEGALLY REQUIRED TRADE-OFF ANALYSIS/BEST-VALUE DETERMINATION

62.     PlanetSpace herein incorporates by reference the allegations set forth in paragraphs 1-61 above.

63. After discussing all three offeror's proposals, the Source Selection Authority concluded that Space-X presented the best value to the government. The Source Selection Authority also concluded that two awards should be made. Thus, the second contract would be awarded to PlanetSpace or to Orbital.

64. When one offeror ranks higher on specified considerations and the other offeror's proposal has a lower cost, FAR § 15.308 requires that the Source Selection Authority conduct a trade-off to determine which remaining proposal presented the best value to government. A trade-off analysis must be supported by a rational explanation demonstrating that the higher rated but higher cost proposal is in fact superior, and explaining why its technical superiority merits the additional costs. *Id.*

65. As discussed *supra* and the remainder of this Complaint, the Source Evaluation Board had rated PlanetSpace superior to Orbital on both of the relevant criteria, Mission Suitability and Price. However, the Source Selection Authority, after little more than a week's consideration of the proposals, disregarded virtually all of the significant strengths and strengths the Source Evaluation Board found in PlanetSpace's proposal after months of consideration. Instead, the Source Selection Authority concluded that Orbital's lower rated proposal was, in fact, technically superior to PlanetSpace's.

66. Even assuming the propriety of this analysis, which Planet Space disputes, PlanetSpace's proposal was still at a materially lower price than Orbital. A trade-off analysis was therefore required.

67. However, the Source Selection Statement does not contain any trade-off discussion of the relevant factors of price versus technical merit. Indeed, the Source Selection Authority openly admitted that he was not performing any trade-off analysis. He wrote: "I could not conduct a "typical" trade-off analysis since I believed there was a low likelihood PlanetSpace could successfully perform the contract."

68. The Source Selection Authority's refusal to perform a trade-off analysis was unlawful:

- The Source Selection Authority failed to compare any of the remaining strengths and weaknesses in PlanetSpace's and Orbital's proposals, including the remaining *eleven* significant strengths or strengths in PlanetSpace's proposal that were not questioned by the Source Selection Authority.

- The Source Selection Authority failed to provide any legitimate justification for his selection of a proposal (Orbital's) rated lower by the Source Evaluation Board, and having a materially higher price than that of PlanetSpace.

- As recited in Count I, the Source Selection Authority lacked authority to make a determination that PlanetSpace did not possess the capacity to perform the contract, and thus could not base his failure to conduct a trade-off analysis on that ground.

69. Accordingly, NASA acted arbitrarily and capriciously, and contrary to law and regulation, in selecting Orbital's proposal without conducting the trade-off analysis required by FAR §15.308 and the Request for Proposals.

70. PlanetSpace's proposal was within the competitive range and one of two remaining offerors under consideration for a second award. Accordingly, PlanetSpace was prejudiced by the Source Selection Authority's failure to engage in the trade-off analysis.

## COUNT III - FAILURE TO ENSURE THE PROPOSAL EVALUATION WAS PERFORMED IN ACCORDANCE WITH THE REQUIREMENTS OF THE REQUEST FOR PROPOSALS

71. PlanetSpace herein incorporates by reference the allegations set forth in paragraphs 1-70 above.

72. Agencies are required to evaluate proposals entirely on the criteria specified in the Request for Proposals, *see* FAR § 15.305(a), and agencies must not rely on

undisclosed evaluation factors. *See Gulf Group, Inc. v. United States*, 56 Fed. Cl. 391, 393-94 (Fed. Cl. 2003).

73.   The Source Selection Authority's decision to select Space-X and Orbital for awards was arbitrary and capricious, lacks a rational basis, and is factually unsupported because it imposed unstated and irrational requirements on the unsuccessful offeror, PlanetSpace.

74.   In the Source Selection Statement, the Source Selection Authority wrote that "although one was not required by the solicitation, I was concerned that [PlanetSpace's proposal] did not contain a backup plan in the event one of the major subcontractors was unable to perform given the sizable amount of responsibilities PlanetSpace proposed to place at the subcontractor level." The Source Selection Authority then concluded that PlanetSpace had a low chance of itself successfully performing then entire contract on its own.

75.   In essence, the Source Selection Authority found that PlanetSpace was not entitled to be awarded the International Space Station contract because it had no backup plan for the hypothetical failure of three of the largest, and most successful, government contractors in aerospace.

76.   The Source Selection Authority admitted that the Request for Proposals contained no requirement for a subcontractor back-up plan, yet supported his decision based on the lack of one in PlanetSpace's proposal. The Source Selection Authority did not require a back-up plan from other offerors, including Orbital.

77.   The Source Selection Authority thus violated the legal requirements that an agency evaluate proposals entirely on the criteria specified in the Request for Proposals, and must not rely on undisclosed evaluation factors.

78.    NASA acted arbitrarily and capriciously, or otherwise not in accordance with law or regulation by imposing extra requirements not found in the Request for Proposals on PlanetSpace's proposal.

79.    These actions were critical in the Source Selection Authority's decision not to select PlanetSpace's proposal for award, and thus, PlanetSpace was prejudiced thereby.

## COUNT IV – THE SOURCE SELECTION AUTHORITY'S EVALUATION OF PAST PERFORMANCE WAS UNEQUAL AND IRRATIONAL

80.    PlanetSpace herein incorporates by reference the allegations set forth in paragraphs 1-79 above.

81.    FAR § 15.305(a)(2)(iii) and the Request for Proposals required NASA, acting through the Source Selection Authority, to consider the past performance of offerors -- including that of subcontractors -- in making an award decision. Offerors "without a record of relevant past performance or for whom information on past performance is not available ... may not be evaluated favorably or unfavorably on past performance." FAR § 15.305(a)(2)(iv).

82.    PlanetSpace's proposal was found by the Source Evaluation Board to have a significant strength for past performance, largely as a result of its subcontractors' lengthy and exemplary record of performance on "highly relevant" government contracts.  Likewise, the Source Evaluation Board found PlanetSpace's proposal to have significant strengths in Company Information for using "sound teaming arrangements" with highly relevant subcontractors.

83.    The Source Evaluation Board also found that Orbital had a significant strength for subcontracting work with highly relevant companies.

84.    The Source Selection Authority agreed with the Source Evaluation Board's assignment of a significant strength to Orbital on the basis of its subcontract approach with companies having strong past performance records, but disregarded the very same finding

23

with respect to PlanetSpace. The Source Selection Authority stated that PlanetSpace's past performance and teaming approach were not significant strengths because "of the absence of a corresponding strength regarding the prime contractor's abilities to perform the contract."

85.     There is no requirement of a corresponding strength set forth anywhere in the Request for Proposals, regulation, or statute, in order that subcontractor past performance be counted in an overall evaluation. Such a requirement is inconsistent with FAR § 15.305(a)(2)(iv)'s mandate that companies without a past performance history may not be evaluated negatively.

86.     Thus, by failing to credit PlanetSpace's proposal with significant strengths for past performance and company information, while at the same time crediting Orbital's proposal for a similar arrangement, the Source Selection Authority failed to conduct the procurement on an equal basis, in contravention of the requirement of full and open competition, FAR § 6.101, FAR part 15 competitive procedures, and the requirements of the Request for Proposals. The Source Selection Authority's selection decision was thus arbitrary and capricious, or not otherwise in accordance with law or regulation.

87.     PlanetSpace was prejudiced by this unequal treatment.

## COUNT V - FAILURE TO RECEIVE APPROVAL FROM THE OFFICE OF SCIENCE AND TECHNOLOGY POLICY FOR THE USE OF FOREIGN MADE LAUNCH VEHICLES

88.     Plaintiff herein incorporates by reference the allegations set forth in paragraphs 1-87 above.

89.     Section V of the National Space Transportation Policy (Dec. 21, 2004) provides that "United States Government payloads shall be launched on space launch vehicles manufactured in the United States, unless exempted by the Director of the Office of Science and Technology Policy, in consultation with the Assistant to the President for National Security

24

Affairs." This requirement for consultation and exemption must be done "as early as possible," and, at a minimum, "prior to the sponsoring…agency's request for authority to negotiate and conclude an agreement."

90.    In its answers to industry questions, NASA recognized that the National Space Transportation Policy applied to the International Space Station cargo resupply procurement contract. *Answers to Questions,* Q76-77.

91.    Orbital's proposal includes Russian made liquid engines and a Ukrainian first stage for its two stage launch vehicle, as well as an Italian built cargo carrier for its transfer vehicle.

92.    Upon information and belief, Orbital's proposed configuration does not meet the US-made requirements of the National Space Transportation Policy. Upon information and belief, NASA did not obtain the required exemption from the Office of Science and Technology Policy, as mandated by the National Space Transportation Policy, that was a necessary predicate to NASA accepting the Orbital proposal.

93.    Accordingly, NASA's award of a contract to Orbital based on a proposal containing foreign made launch and transfer vehicles was arbitrary and capricious, and not otherwise in accordance with law.

94.    PlanetSpace was prejudiced by NASA's failure to follow the requirements of the National Space Transportation Policy because, upon information and belief, Orbital's proposal did not provide a US-made launch vehicle and spacecraft compliant with that Policy. Given that Orbital's proposal did not satisfy National Space Transportation Policy requirements, PlanetSpace would have received the second award had NASA complied with that Policy.

## COUNT VI - IMPROPER AGENCY ACTION - IRRATIONAL AND UNEQUAL ASSIGNMENT OF WEAKNESSES TO THE PLANETSPACE PROPOSAL

95.    Plaintiff herein incorporates by reference the allegations set forth in paragraphs 1-94 above.

96.    An agency's procurement decision must have a rational basis. *Wackenhut Srvcs. Inc. v. United States*, 85 Fed. Cl. 273, 290 (2009). A procurement decision does not have a rational basis if it is conclusory, inadequately documented, or based on incorrect facts.

97.    A "weakness" is a perceived flaw in a proposal that increases the risk of unsuccessful contract performance. FAR §15.001. A "significant weakness" in a proposal is a flaw that *appreciably* increases the risk of unsuccessful contract performance. *Id.* Weaknesses are not considered discriminators for or against selection, and are not typically presented to the Source Selection Authority. NASA FAR Supp. § 1815.370(i)(6)(i). All three offeror proposals submitted in response to the International Space Station Request for Proposals had multiple weaknesses, according to the Source Evaluation Board.

98.    However, the Source Selection Authority systematically elevated PlanetSpace's evaluated weaknesses to significant weaknesses and discriminators against selection, without: 1) considering clarifications in PlanetSpace's final proposal or explanations provided during discussions with the Source Evaluation Board, and 2) providing adequate explanation for such elevation.

99.    In particular, the Source Selection Authority's conclusion that PlanetSpace's proposal had a significant weakness because it planned to use "cost reimbursement" subcontracts for "much of the work" to be done under its fixed price prime contract with NASA is without a factual basis and is thus irrational and unsupportable.

26

100.     PlanetSpace's final revised proposal, and the information the Company provided during discussions, make clear that the vast majority of the work to be subcontracted would be done under *fixed price* subcontracts. In fact, 83% of the subcontracted work was on a fixed price basis.

101.     The remaining 17% did not create a risk of nonperformance, and could not support a discriminator against selection. These parts of the contracts were for development work to be done on already well-developed heritage components. Much of this work was itself to be subcontracted by PlanetSpace's subcontractors on a fixed price basis.

102.     Furthermore, PlanetSpace has built into its subcontract arrangements several incentives for subcontractors to control costs, including profit sharing. Internal controls were also put into place. PlanetSpace's management team included several employees with decades of experience in managing cost reimbursement subcontracts, including those performed under fixed price prime contracts. The Source Selection Authority failed to address or even acknowledge any of these facts, all of which had been provided to NASA.

103.     The Source Selection Authority also failed to acknowledge or address the fact that PlanetSpace has secured ample funding to absorb any cost overruns on the relatively small amount of subcontract work to be performed on a cost-reimbursement basis.

104.     In addition, the Source Selection Authority failed to consider that one of the elements of risk in his conclusion had been eliminated. PlanetSpace had proposed to use an existing vehicle in order to meet a possible early launch date, and a different vehicle for subsequent launches. However, the Source Selection Authority later acknowledged that "I was informed that NASA would not be required to order the early mission involving the proposed use of the alternate launch vehicle."

105.    Nonetheless, the Source Selection Authority failed adequately to consider the impact in this change on PlanetSpace's proposal. Instead, the Source Selection Authority merely surmised that the financial risk from using two vehicles was still a weakness justifying a negative discriminator because failure to order the early flight would "cause the NASA payments to PlanetSpace to occur later." However, PlanetSpace had addressed this contingency in its business case, which was contained in its proposal.

106.    Because the Source Selection Authority's decision is demonstrably uninformed, it has no rational basis, and thus his selection decision was arbitrary and capricious.

## V.    The GAO Protest

107.    On January 13, 2009, PlanetSpace filed a protest of the NASA's awards at the Government Accountability Office.

108.    NASA overrode the automatic stay of contract performance, *see* 31 U.S.C. § 3553, stating that continued performance was required due to "urgent and compelling circumstances that significantly affect interests of the United States." 31 U.S.C. § 3553(d)(3).

109.    PlanetSpace moved the Court of Federal Claims to reinstate the stay of performance. PlanetSpace's motion was denied on March 13, 2009. The Court emphasized that its review was limited to determining whether the NASA override decision was arbitrary and capricious, and that the Court was not engaging "in any consideration of the merits of the underlying contract award." *PlanetSpace Inc. v. United States*, No. 09-0099C (Fed. Cl. March 13, 2009).

110.    On April 22, 2009, the GAO denied the protest.

111.    Subsequent to the GAO decision, PlanetSpace and NASA engaged in extensive discussions and correspondence in an effort to resolve this controversy. Such efforts ultimately proved unsuccessful, leading to the initiation of this lawsuit.

## REQUEST FOR RELIEF

112.    As described in Counts I-VI above, NASA made prejudicial errors in administering this procurement that were arbitrary and capricious, lacked a reasonable basis, and violated statute and regulation.

113.    PlanetSpace is fully qualified to perform under the contract award pursuant to the solicitation. There is more than a reasonable likelihood that PlanetSpace would have been awarded one of the contracts absent the violations set forth in this Complaint.

114.    This Court should declare that NASA violated both statues and regulations in its evaluation of PlanetSpace's proposal and that NASA made prejudicial errors in administering this procurement that were arbitrary and capricious, lacked a reasonable basis, and violated statute and regulation.

115.    As a result of NASA's unlawful actions, by and through the actions of its Source Selection Authority, PlanetSpace will suffer irreparable injury for which there is no adequate legal remedy. The balance of hardships militates in favor of PlanetSpace's requested relief.

116.    The Court should enter a permanent injunction remanding the subject procurement to NASA, and requiring NASA, its officers, agents, servants, employees and representatives, and all persons acting in concert and participating with them respecting the subject procurement, to reprocure the services awarded in the International Space Station resupply contracts, in accordance with statutes, regulations and a reasonable exercise of

discretion, with such re-procurement to be completed within 60 days of the date of the Court's decision, absent good cause.

117.    PlanetSpace is not seeking a temporary restraining order or preliminary injunction against further contract action, in recognition that NASA's re-review of the selection decision will likely result in the displacement of a single contractor, and, as such, the remaining original awardee's work should not be delayed unnecessarily.  Alternatively, reopening the procurement might result in a third award, requiring no disruption of any contract work in progress.

118.    The relief requested by PlanetSpace will not injure NASA and will serve the public interest by insuring that the procurement is conducted pursuant to statute and regulation.   NASA's violations of federal procurement statutes, regulations, and policies adversely affect and undermine the integrity of the federal procurement process.  The relief requested by PlanetSpace will insure that NASA protects the public interest by preserving the integrity of the system and public confidence in the federal procurement process, thereby promoting competition for federal government contracts.

119.    The Court should Grant Plaintiff such other and further relief, including costs, as the Court may deem just and proper.

Respectfully submitted,

Steven J. Rosenbaum
*Counsel of Record*
Derron J. Blakely
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20044
(202) 662-5568
(202) 778-5568 fax
srosenbaum@cov.com
*Counsel for Plaintiff*
*PlanetSpace Inc.*

July 23, 2009

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of Plaintiff's Complaint, to be served by hand delivery, upon the following person on the 23rd day of July, 2009:

Attorney in Charge of Litigation
U.S. Department of Justice
Commercial Litigation Branch
1100 L Street, NW, 8th Floor
Washington, DC 20530.

Derron J. Blakely
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20044