# United States Court of Federal Claims

**No: 09-476 C**
**(Filed Under Seal:  April 6, 2010)**
**(Reissued: April 26, 2010)***

———————————————————

**PlanetSpace Inc.,**

> *Plaintiff,*

**v.**

**United States of America,**

> *Defendant,*

**Space Exploration Technologies Corporation,**

> *Intervenor,* **and**

**Orbital Sciences Corporation,**

> *Intervenor.*

———————————————————

Bid Protest; Laches; FRE 408;
Application of U.S. Space
Transportation Policy;
Supplementing the Administrative
Record; Undisclosed Evaluation
Criteria; Past Performance;
Contractor Responsibility; Trade-
off Analysis; Evidentiary Weight
of Previous GAO Testimony;
Remand to Agency

*Steven J. Rosenbaum*, *Derron J. Blakely*, *Scott A. Freling*, *Greta S. Milligan*, *Abram J. Pafford*, Covington & Burling LLP, Washington, DC, for plaintiff.

*William G. Kanellis*, *Stacey K. Grigsby*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

*David A. Churchill*, *Kevin C. Dwyer*, *Daniel E. Chudd*, *Caroline A. Keller*, *Anna M. Baldwin*, Jenner & Block LLP, Washington, DC, for intervenor Orbital Sciences Corporation.

*Richard J. Vacura*, *Keric B. Chin*, *Marc A. Hearron*, Morrison & Foerster LLP, McLean, VA, for intervenor Space Exploration Technologies Corporation.

———————————————

* This opinion originally issued under seal on April 6, 2010.  The court afforded the parties an opportunity to propose redactions in the published opinion, and subsequently directed the parties

_____

to "set forth, with specificity, the reasons why each proposed redaction constitutes proprietary, confidential, or competition-sensitive information, . . . or otherwise implicates a legitimate privacy interest of any party."  Court's April 15, 2010 Order.  The parties have jointly proposed redactions of what they characterize as competition-sensitive or source-selection information.

In considering the parties' proposed redactions, the court is mindful of "the presumption of public access to judicial records."  *Baystate Techs., Inc. v. Bowers,* 283 Fed. Appx. 808, 810 (Fed. Cir. 2008) (Table) (citing *Siedle v. Putnam Invs., Inc.*, 147 F.3d 7, 9 (1st Cir. 1998)); *see Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 599 (1978) (assuming that the "common-law right of [public] access" applied to the tape recordings in that case).  The Federal Circuit has held that, in determining whether initially sealed court records should remain sealed, and the information therein permanently withheld from the public, "the court must balance the privacy interests of the parties against the public interest in access to the . . . information."  283 Fed. Appx. at 810 (remanding to the trial court for the requisite balancing); *see Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 314 n.1 (2009) (citing the *Bowers* balancing requirement before deciding to accept "some, but not all, of defendant's proposed redactions"); *Madison Servs., Inc. v. United States*, __Fed. Cl. __, 2010 WL 1221304 at *11–12 (2010) (conducting the requisite balancing  before deciding to "reject[] most, though not all, of defendant's proposed redactions").

In light of this necessary balancing, the court finds the parties' proposed redactions to be overly broad.  On the one hand, the court cannot fathom how some of the proposed redactions implicate any competition-sensitive or otherwise confidential information.  A prime example are quoted portions of the Source Selection Authority's ("SSA") testimony during plaintiff's protest at the Government Accountability Office ("GAO"), *PlanetSpace, Inc.*, B-401016 *et al.*, 2009 CPD ¶ 103 (Comp. Gen. Apr. 22, 2009): this testimony describe the SSA's trade-off analysis in general terms, without reference to any specific information in the parties' proposals.  On the other hand, technical or other details from the parties' proposals—such as contract line-item pricing—clearly constitute competition-sensitive information, the disclosure of which would allow a party's competitors to gain an unfair advantage in future competitions.  To such an important private interest, the presumption in favor of public access must yield.  *See Siedle*, 147 F.3d at 10 ("Important countervailing interests can, in given instances, overwhelm the usual presumption and defeat [public] access.").  Accordingly, the balance of the pubic interest in access against the parties' interests in confidentiality weighs in favor of accepting some, but not all, of the proposed redactions.  All redactions are indicated by brackets, [].

# OPINION and ORDER

Block, *Judge*.

# I. INTRODUCTION

Orbiting at an altitude of 250 miles, the International Space Station ("ISS") is the largest spacecraft ever built, at times observable from Earth using only the naked eye. The ISS represents the combined efforts of fifteen nations over fifteen years and an investment of tens of billions of dollars. When fully assembled, the ISS will serve as an observatory, a laboratory, and a workshop in space. Already the ISS contains over 10,850 cubic feet of habitable volume, carries a crew of six astronauts, and hosts nineteen scientific research facilities.

Under various international agreements, defendant, acting through the National Aeronautics and Space Administration ("NASA"), is responsible for providing cargo transportation services to the ISS. To date, NASA has fulfilled this commitment by using its aging fleet of space shuttles. However, NASA plans to discontinue the space shuttle program in 2010. To meet its on-going ISS cargo transportation commitments, NASA has decided to turn to the Nation's still-nascent private space industry.

To this end, on April 14, 2008, NASA issued Request for Proposals No. NNJ08ZBG001R (the "RFP"), to procure cargo transportation services to and from the ISS under fixed-price, indefinite delivery/indefinite quantity contracts. Administrative Record ("AR") 1306, 1314, 1364. Plaintiff, PlanetSpace Inc. ("PlanetSpace"), and intervenor-defendants, Space Exploration Technologies Corporation ("Space-X") and Orbital Sciences Corporation ("Orbital"), submitted proposals in response to the RFP. AR 2723–24. As the caption suggests, NASA selected only Space-X and Orbital for contract awards. AR 5181. Each of these awards guarantees a minimum contract value of approximately $1.5 billion, Compl. ¶ 1, and a maximum value of $3.1 billion, AR 1925.

After an unsuccessful bid protest at the United States Government Accountability Office ("GAO"), *PlanetSpace, Inc.*, B-401016 *et al.*, 2009 CPD ¶ 103 (Comp. Gen. Apr. 22, 2009), plaintiff filed the instant complaint. Plaintiff's complaint recites six counts alleging that: (1) NASA's source selection authority ("SSA")[1] unlawfully rejected plaintiff's proposal after making a *de facto* non-responsibility determination; (2) the SSA did not perform a legally sufficient trade-off analysis; (3) the SSA improperly evaluated plaintiff's proposal by using a criterion not included in the RFP and by failing to apply that same criterion to the intervenors' proposals; (4) the SSA evaluated plaintiff's past performance in an improper manner; (5) NASA failed to comply with the U.S. Space Transportation Policy (the "Space Policy"); and (6) the SSA articulated conclusions in his source

---

[1] For most procurements, responsibility for the selection decision lies with the contracting officer. FAR 15.303. However, in more formal and complex procurements, such as this one, the agency head may delegate this responsibility to another individual known as the "source selection authority" or "SSA." *See id.*; RALPH C. NASH, JR. ET AL., THE GOVERNMENT CONTRACTS REFERENCE BOOK 483 (2d ed. 1998).

selection decision that were without factual support and were, therefore, irrational.  Compl. ¶¶ 46–106.

Mindful of its obligation not to "substitute its judgment for that of the agency," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), the court finds for defendant on counts (3)–(6), and withholds decision on counts (1) and (2).  Proceedings in this matter are stayed pending a remand to NASA for further explanation, as outlined below.

## II. FACTUAL AND PROCEDURAL BACKGROUND

As stated above, the RFP sought to procure cargo transportation services to and from the ISS over the next seven years.  More specifically, under the terms of contract line item number ("CLIN") 0001, awardees would be called upon to transport cargo to the ISS, return cargo from the ISS, and dispose of unneeded cargo.  AR 1925–26, 1978.  This cargo could include either pressurized or unpressurized payloads.  AR 1926, 1978.   Awardees would also provide various "non-standard services" under CLIN 0002 and perform "special task assignments and studies" under CLIN 0003. AR 1927–28.

Using the "best value" trade-off process described at FAR 15.101-1,[2] proposals were to be evaluated on the basis of two evaluation factors: (1) mission suitability and (2) price.  AR 2089.  The mission suitability evaluation factor was more important than price and included three subfactors: (a) technical approach (550 points), (b) management plan (400 points), and (c) small business utilization (50 points).  *Id.*  An offeror's relevant past performance would not be scored separately, but instead would be evaluated as part of each mission suitability subfactor.  AR 2090.  With regard to evaluating price, the RFP stated that prices offered under CLIN 0001 were substantially more important than prices offered under CLINs 0002 and 0003.  AR 2094.

The RFP also required offerors to certify whether or not they would use "space vehicles manufactured in the United States in accordance with the U.S. Space Transportation Policy."  AR 1972.  The Space Policy is a national security presidential directive, which provides, in part, that "United States Government payloads shall be launched on space launch vehicles manufactured in the United States, unless exempted by the Director of the Office of Science and Technology Policy, in consultation with the Assistant to the President for National Security Affairs."  U.S. SPACE TRANSPORTATION POLICY FACT SHEET 7 (2005), http://fas.org/irp/offdocs/nspd/nspd-40.pdf.[3]

---

[2] FAR 15.101-1(c) states that "[t]his process permits tradeoffs among cost or price and non-cost factors and allows the Government to accept other than the lowest priced proposal."

[3] Having been recently declassified, the Space Policy is designated as "For Official Use Only." Def.'s Notice of Filing at 1.  Accordingly, at the outset of these proceedings, the Space Policy was not available to plaintiff or the public.  Plaintiff instead relied on the above-cited, publicly available "Fact Sheet" concerning the Space Policy.  *See, e.g.*, Pl.'s Mot. for J. at 27.  The court requested that defendant provide the court with a copy of the Space Policy itself and defendant agreed.  Tr. 130. Having compared the Space Policy to the Fact Sheet, the court is satisfied that the Fact Sheet accurately represents the contents of the Space Policy.  In the interest of protecting the sensitive information contained within the Space Policy, the court will only quote and cite to the publicly available Fact Sheet.

During discussions, NASA notified offerors that "[h]istorically, the domestic manufacturing requirement has been interpreted to apply to launch vehicles and not payloads." AR 1503, 30861. Regardless, under the terms of the RFP, NASA was to consult the Office of Science and Technology Policy ("OSTP") about the application of the Space Policy to any specific proposal. *Id.*

Plaintiff, Orbital, and Space-X were the only contractors to submit initial proposals in response to the RFP. AR Tabs 68–80. Of the three, only plaintiff represented that it was a small business. AR 10303. Plaintiff was also the only offeror to propose a teaming arrangement, which consisted of itself, Lockheed Martin, Boeing, and Alliant Techsystems, Inc. AR 10235–40, 10455. Under this teaming arrangement, plaintiff would retain contract and financial management tasks and would subcontract the design, development, production, and operation of space services to other members of its team. *See* AR 10594–98.

After reviewing their initial proposals, the contracting officer decided to include all three offerors in the competitive range and to conduct discussions with each in an effort to negotiate the best value for the government. AR 2723–24. The contracting officer also ordered a pre-award survey[4] of the offerors, AR 2691, the results of which would help him make a timely responsibility determination[5] regarding any prospective contract-awardee. *See* FAR 9.106-1(a) ("A preaward survey is normally required only when the information on hand or readily available to the contracting officer, including information from commercial sources, is not sufficient to make a determination regarding responsibility.").

On November 10, 2008, the offerors submitted their final proposals. AR Tabs 84–98. A source evaluation board ("SEB") performed a detailed comparison of the final proposals using the evaluation factors set forth in the RFP. AR Tab 53. The results of the SEB's analysis regarding mission suitability, AR 4470, are summarized below:

| | Overall Mission Suitability Score (1000 pts max) | Technical Approach (550 pts max) | Management Approach (400 pts max) | Small Business Utilization (50 pts max) |
|---|---|---|---|---|
| **Space-X** | 877 | 495 | 340 | 42 |
| **PlanetSpace** | 827 | 473 | 312 | 42 |
| **Orbital** | 796 | 413 | 348 | 35 |

With regard to mission suitability, the SEB felt that all of the proposals were "very good," but that Space-X submitted the best proposal, followed by plaintiff, and finally Orbital. *Id.*

---

[4] A pre-award survey is "an evaluation of a prospective contractor's capability to perform a proposed contract." FAR 2.101 (defining "Preaward survey").

[5] A "responsibility determination" is a pass/fail inquiry conducted by the contracting officer before contract award. *See* FAR 9.103. Generally speaking, the contracting officer's responsibility determination focuses on whether the prospective contract-awardee possesses the ability and capacity to perform the contract. *See Centech Group, Inc. v. United States*, 554 F.3d 1029, 1034 n.2 (Fed. Cir. 2009); FAR 9.104-1.

In performing its price analysis, the SEB calculated, for each proposal, a weighted price average per kilogram of cargo transported. AR 2094, 5023. This weighted price average provided a common comparison point for evaluating offerors' price proposals across multiple calendar years and multiple CLINs.[6] *See* AR 31045.8. The SEB illustrated its price analysis in numerous graphs and tables contained in its final report. AR 5016–35. These graphs and tables show that, overall, Space-X enjoyed an appreciable price advantage over plaintiff, which in turn, enjoyed a significant price advantage over Orbital. *Id.* For example, the SEB calculated that the price of transporting one kilogram of pressurized cargo to the ISS and back again in the year 2013 would be $[**number redacted**] under Space-X's proposal, $[**number redacted**] under plaintiff's proposal, and $[**number redacted**]–$[**number redacted**] under Orbital's proposal.[7] AR 5020.

In sum, in the SEB's view, Space-X's proposal was superior in both price and mission suitability to plaintiff's proposal, and plaintiff's proposal was superior in both price and mission suitability to Orbital's proposal. The SEB presented these findings to the SSA, William Gerstenmaier, on December 15, 2008. AR 4466.

While the SEB was conducting its analysis, a member of NASA's pre-award survey team sent an email to the SSA with a draft of the final pre-award survey attached. AR 16683. The email invited the SSA to consider the draft when evaluating the offerors' proposals. *See* AR 16683 ("this draft will be current enough for you to get a feel for the performance risk of each of the potential providers"). [**one sentence redacted**]

The SSA made his source selection decision on December 23, 2008, eight days after the SEB presented its findings. The SSA accepted the SEB's price analysis, finding that "[Space-X] proposed the lowest overall price, with the price proposed by PlanetSpace being the next lowest overall price, and with Orbital's price being the highest overall proposed price." AR 5181. Notably,

---

[6] The RFP required, and the parties provided, lengthy and complicated price proposals in table format. AR 1925–29. Plaintiff's price proposal alone spanned twenty-three pages. AR 10961–83. For example, under CLIN 0001, offered prices could and did vary by: (1) calendar year of performance; (2) whether the cargo was pressurized or unpressurized; (3) the aggregate mass of the cargo being transported; (4) and the desired disposition of the cargo, i.e., whether the cargo was going to the ISS, coming from the ISS, or being discarded. AR 1925–26. The SEB's weighted price average provided the SSA with an analytical starting point when trying to assess which proposals were least expensive and by roughly how much.

[7] Plaintiff has consistently asserted that its proposal was $[**number redacted**] million less expensive than Orbital's proposal. *See* Pl.'s Mot. For J. at 35; Tr. 23. However, it is impossible to quantify the exact difference in price between the competing proposals due to the indefinite nature of the proposed contract. Apparently, what can be said is that plaintiff's price per kilogram of cargo transported was approximately [**number redacted**] to [**number redacted**] percent less expensive than Orbital's price. *See* AR 31160 (SSA testifying that "in the simplest of terms . . . Orbital is around $[**number redacted**] per kilogram and PlanetSpace sits about probably $[**number redacted**] to $[**number redacted**] per kilogram"); Tr. 95 (Orbital's counsel stating that "there was a very distinct price differential of about $[**number redacted**] [per kilogram] for Orbital versus $[**number redacted**] [per kilogram] for PlanetSpace").

however, the SSA did not quantify or estimate the magnitude of the overall price difference between the proposals in his decision.  AR 5180–81.

With regard to mission suitability, the SSA accepted the SEB's conclusions regarding Space-X and Orbital's proposals, but he did not accept the SEB's analysis of plaintiff's proposal.  AR 5173–80.  Indeed, the SSA was considerably more critical of plaintiff's proposal than was the SEB.  What were once "significant strengths" in plaintiff's proposal became "not relevant for purposes of selection"; mere "weaknesses" became "significant discriminator[s]."  AR 5175.  For example, the SSA wrote:

> The SEB identified five weaknesses associated with the PlanetSpace Management approach, three of which I found to be significant for purposes of selection.  The first weakness involved the use of cost-plus subcontracts for the large subcontractors until first flight, subcontractors which were responsible for the majority of the work and would be addressing technical difficulties identified in the proposal.  (Finding 266)  The SEB raised this issue during oral and written discussions because the finding was initially identified as a significant weakness in PlanetSpace's proposal.  PlanetSpace retained the same contract type in its [final proposal], but told the SEB it would manage the risk through incentives and cost controls.  I believed the subcontracting structure still represented a significant risk to the successful performance of the program.  I believed it was extremely risky for PlanetSpace to have a fixed-price contract with NASA when most of the effort in the early stages would be performed under cost type subcontracts.  Moreover, I questioned whether PlanetSpace could successfully manage much larger subcontractors responsible for the majority of the performance under the contract.  Furthermore, although one was not required by the solicitation, I was concerned that the proposal did not contain a backup plan in the event one of the major subcontractors was unable to perform given the sizable amount of responsibilities PlanetSpace proposed to place at the subcontractor level.

AR 5176.  Another example of the SSA downgrading plaintiff's proposal is this excerpt:

> The SEB also was concerned about the high financial risk to the Government prior to the successful demonstration of critical new technologies due to the proposed early completion of, and therefore payment for, successful completion of ISS integration.  (Finding 270)  The SEB considered this only to be a weakness because PlanetSpace identified the problem and explained how it intended to manage the issue.  I disagreed with [the] relevance the SEB assigned to this finding and instead concluded the financial risk PlanetSpace proposed to assume was a discriminator for selection.  PlanetSpace would be making a considerable investment in the program with two different launch vehicles, yet did not project it would reflect positive cumulative cash from operations until nearly the end of the contract.

AR 5177.

When the SSA documented his comparative analysis of the technical merits of the proposals, he agreed with the SEB that Space-X submitted the best proposal on the basis of mission suitability.  AR 5179.  Nevertheless, after citing the concerns above, as well as others, the SSA elevated

Orbital's proposal over plaintiff's in terms of mission suitability, stating that he "had much higher confidence in Orbital's ability to provide resupply services on a fixed-price basis."  AR 5180.

Because Space-X submitted the best proposal under both mission suitability and price, no trade-off analysis was necessary in selecting Space-X. AR 5181.  However, the SSA concluded that it was in NASA's best interests to make a second award to Orbital.  *See id.*  The portion of the source selection decision explicitly documenting the SSA's trade-off analysis supporting this second award to Orbital is reproduced below:

> I concluded the proposal from Orbital was superior due to the serious Management risks inherent in PlanetSpace's proposal: however, I recognized PlanetSpace had a lower overall price than the Orbital proposal.  I had reservations with regard to PlanetSpace's ability to successfully address the technical challenges associated with its proposal given the risks I identified in its Management approach.  Although I recognized the evaluation criteria provided that Mission Suitability was more important than price, I could not conduct [a] "typical" trade-off analysis since I believed there was a low likelihood PlanetSpace could perform the contract.

*Id.*  On the same day that the SSA issued his source selection decision, the contracting officer issued contract awards to Space-X and Orbital.  AR 5252–53.

On January 13, 2009, plaintiff filed its initial protest at GAO, alleging sixteen discrete points of error in NASA's procurement decision.  AR Tab 184.  Three weeks later, plaintiff filed a supplemental protest, alleging an additional seven points of error.  AR Tab 185.  Combined, plaintiff's allegations struck at nearly every facet of NASA's decision, including the legality and rationality of both the SEB's and the SSA's analyses of all three offerors' proposals.  AR Tabs 184–85.  By contrast, plaintiff's protest before this court is much narrower in scope, focusing almost exclusively on the SSA's analysis of plaintiff's proposal.  While many of plaintiff's arguments before this court are identical to those raised in its GAO protest, AR 30925–28, 30931–34, 30942–43, counts (1) and (5) represent new grounds for challenge, and count (2) receives much greater emphasis.

After receiving plaintiff's initial filing, GAO implemented the automatic stay provision of the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3553(d)(3)(A)(ii), thereby suspending Space-X's and Orbital's contract performance.  *PlanetSpace, Inc. v. United States*, 86 Fed. Cl. 566, 567 (2009).  NASA then issued an override of the CICA stay on February 10, 2009, pursuant to 31 U.S.C. § 3553(d)(3)(C), citing urgent and compelling circumstances, specifically defendant's ongoing need to fulfill its international obligations to the ISS.  *PlanetSpace, Inc.*, 86 Fed. Cl. at 567–58.  Plaintiff responded by filing a complaint before Judge Hodges of this court, challenging NASA's override decision and seeking a reinstatement of the CICA stay.  *Id.* at 566–67.  After noting that the court "review[s] the merits of an override independent of any consideration of the merits of the underlying contract award," Judge Hodges held that NASA did not act arbitrarily or capriciously in overriding the CICA stay.  *Id.* at 567–68.

Meanwhile, litigation at GAO continued unabated.  GAO held a three-day hearing, wherein the SSA and three members of the SEB testified.[8]  Tabs 188–89.  At some point during the course of the GAO protest, plaintiff abandoned its challenge to Space-X's award.  *PlanetSpace, Inc.*, 2009 CPD ¶ 103, at *6.  Ultimately, on April 22, 2009, GAO denied plaintiff's protest, finding "no basis for questioning the award to [Orbital]."  *Id.*

Three months after GAO issued its decision, plaintiff filed the instant complaint.  Compl. at 1.  In its complaint, plaintiff lodges the six counts enumerated in the introduction and asks the court to issue an injunction ordering NASA to reprocure the services contemplated in the RFP.  Compl. ¶¶ 2, 116.  Notably, plaintiff does not ask this court to enjoin Space-X's or Orbital's contract performance while NASA conducts this proposed reprocurement.  Compl. ¶ 117; Pl.'s Reply at 25; Tr. 230.

Soon after plaintiff filed its complaint, the parties found themselves embroiled in a dispute over the contents of the administrative record.  The parties submitted three motions which sought either to add to, or to subtract from, the record, two of which were the subject of this court's opinion in *PlanetSpace, Inc. v. United States*, 90 Fed. Cl. 1 (2009).  Today, the court resolves the remaining motion.

The court heard oral argument on November 10, 2009, and the case is now before the court on the parties' cross-motions for judgment on the administrative record, pursuant to the RULES OF THE UNITED STATES COURT OF FEDERAL CLAIMS ("RCFC") 52.1.  However, before turning to the merits of the parties' cross-motions, the court must first address defendant's contention that plaintiff's case is barred by the equitable doctrine of laches.

# III. DISCUSSION

## A. The Doctrine of Laches Does Not Bar Plaintiff's Claim

Defendant argues that, because plaintiff filed its complaint three months after losing its bid protest at GAO, plaintiff was "dilatory" in asserting its rights and, therefore, its claim is barred by the doctrine of laches.  Def.'s Resp. at 49–50.  To assert successfully the affirmative defense of laches, defendant must show that: (1) plaintiff delayed filing suit for an unreasonable and inexcusable period from the time it knew or reasonably should have known of its claim against defendant; *and* (2) the delay operated to the prejudice or injury of defendant.  *Poett v. Merit Sys. Prot. Bd.*, 360 F.3d 1377, 1384 (Fed. Cir. 2004) (citing *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992) (*en banc*)).  This requirement is framed in the conjunctive; thus defendant must demonstrate both unreasonable delay and prejudice, in order to succeed in asserting this defense.

Plaintiff argues that the three-month delay was entirely reasonable and due, in part, to the parties' good faith, but ultimately unsuccessful, settlement negotiations.  Pl.'s Reply at 28–29.  Plaintiff provides evidence of these negotiations in the form of a declaration from its chairman and

---

[8] The transcript of this testimony is properly before the court pursuant to the RULES OF THE UNITED STATES COURT OF FEDERAL CLAIMS, App. C, ¶ 22(u).  However, the degree to which this court should rely on this testimony is hotly debated.  *See* discussion *infra* p. 30.

email correspondence between its chairman and NASA. Declaration of Kathuria ¶¶ 4–6, Ex. A (Oct. 2, 2009). Defendant opposes the admission of this evidence on the grounds that it violates Rule 408 of the FEDERAL RULES OF EVIDENCE ("FRE"). Def.'s Reply at 19–20.

Defendant has made many good arguments during the course of these proceedings; this is not one of them. FRE 408(a)(2) precludes the admission of "conduct or statements made in compromise negotiations" to prove, *inter alia*, a claim's validity. "If such evidence were routinely allowed in . . . lawsuits, it would give any litigant pause before settling." *Abundis v. United States*, 15 Cl. Ct. 619, 621 (1988). Thus, the rule serves to promote settlement between parties. *See Adv. Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1308 (Fed. Cir. 2001) ("[W]e are mindful . . . of the policy in favor of protecting settlement agreements from being admitted as evidence, thus serving to encourage settlements."). However, such evidence is admissible when presented for a purpose other than those proscribed by FRE 408(a). FRE 408(b). In fact, the rule expressly permits evidence offered to "negat[e] a contention of undue delay." *Id.* Therefore, the declaration and email correspondence that plaintiff has submitted are perfectly admissible, and they serve to prove plaintiff's contention that the delay was reasonable.

Even if the court were to ignore plaintiff's evidence of good faith negotiations and were to conclude that there was no reason for the delay in filing, defendant's laches argument would still fail. "When a limitation on the period for bringing suit has been set by statute, laches will generally not be invoked to shorten the statutory period." *Adv. Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993) (citing *Cornetta v. United States*, 851 F.2d 1372, 1377–78 (Fed. Cir. 1988) (*en banc*)). This bid protest is properly before the court pursuant to 28 U.S.C. § 1491(b) and thus is governed by the Tucker Act's six-year statute of limitations set forth at 28 U.S.C. § 2501. Absent "extraordinary circumstances," this court will not invoke laches to bar an otherwise timely protest. *CW Gov't Travel, Inc.*, 61 Fed. Cl. 559, 569 (2004) ("Had Congress wanted to set a statute of limitations on bid protest actions, it would have done so. Because Congress did not so limit the jurisdiction of this court to hear such actions, we would be reluctant to invoke laches except under extraordinary circumstances that are not present in this case."). To be sure, defendant has not cited, and the court is not aware of, a single instance in which the court invoked laches to bar a bid protest that was filed a mere three months after a failed GAO protest or a mere seven months after contract award.

Defendant opines that "if [c]ontract performance were interrupted at this juncture, the impact would be devastating." Def.'s Resp. at 50. This argument, however, is better directed at whether the court should issue the requested injunction[9] than whether it should invoke laches to bar plaintiff's case. Merely litigating the case will not interrupt contract performance. Defendant's

---

[9] Assuming plaintiff succeeds on the merits of its case, it does not automatically follow that plaintiff's requested injunction will issue. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1225–26 (Fed. Cir. 2004) ("[S]ection 1491(b)(4) only incorporates the standard of review of section 706(2)(A) and therefore does not deprive a court of its equitable discretion in deciding whether injunctive relief is appropriate."). The court would first need to consider whether: (1) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (2) the balance of hardships between the parties favors the grant of injunctive relief; and (3) granting injunctive relief is in the public interest. *Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009).

argument wrongly proceeds on the assumption that an injunction interrupting contract performance[10] is the only relief available to plaintiff.  *See* 28 U.S.C. § 1491(b)(2) (explicitly permitting the award of "bid preparation and proposal costs"); *CSE Constr. Co. v. United States*, 58 Fed. Cl. 230, 263 (2003) (sustaining plaintiff's bid protest, denying plaintiff's requested injunctive relief, and granting plaintiff's bid preparation costs).  In other words, this court could sustain plaintiff's protest and provide plaintiff with a remedy without interrupting contract performance at all.  Surely, then, these are not the "extraordinary circumstances" sufficient to deny plaintiff its day in court.  *See CW Gov't Travel*, 61 Fed. Cl. at 569.  Accordingly, defendant's laches argument fails.

## B. Standards of Review

This court possesses jurisdiction over bid protest matters pursuant to 28 U.S.C. § 1491(b), which also provides that challenged procurement actions are to be reviewed under the standard set forth in the Administrative Procedures Act ("APA") at 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  Accordingly, the court will only set aside an agency's contract award if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Stated another way, plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law.  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009).  The Supreme Court has described the APA standard of review as "a narrow one" and cautioned that the "court is not empowered to substitute its judgment for that of the agency."  *Citizens to Pres. Overton Park*, 401 U.S. at 416.

Plaintiff's otherwise "heavy burden" under the APA standard, *Impresa*, 238 F.3d at 1333, is heavier still where, as here, the challenged contract award was made subsequent to negotiated procurement rather than sealed bidding.  *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004).  During negotiated procurement, in contrast to sealed bidding, the selection official is permitted to make "tradeoffs among cost or price and non-cost factors" and to accept a higher-priced proposal, so long as the "perceived benefits of the higher priced proposal . . . merit the additional cost."  FAR 15.101-1(c).  This is in an inherently judgmental process, in which the selecting official enjoys broad discretion.  *Galen Med. Assocs., Inc.*, 369 F.3d at 1330.  "Because of the breadth of discretion given to the [selecting official], the burden of showing this discretion was abused, and that the action was 'arbitrary and capricious' is certainly much heavier than it would be in a case of [sealed bidding]."  *Burroughs Corp. v. United States*, 617 F.2d 590, 598 (Ct. Cl. 1980).

Should plaintiff meet its burden and demonstrate an error in the procurement process, the court must then conduct a factual inquiry to determine whether the plaintiff was prejudiced by the error.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351, 1353 (Fed. Cir. 2005).  To demonstrate prejudice, plaintiff must show "that there was a *substantial chance* it would have received the contract award but for [the] error."  *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (emphasis added).  This standard is not so demanding as to require a showing

---

[10] Whether plaintiff's requested injunction would result in an interruption in contract performance is another point of contention between the parties, as is the degree of harm that would flow from any such interruption.  Tr. 194–225, 229–34, 238–40, 242–45.

of actual causation, i.e., that, but for the error, plaintiff would have won the contract.  *See Bannum, Inc.*, 404 F.3d at 1358.

Where, as here, the parties have filed cross-motions for judgment on the administrative record pursuant to RCFC 52.1, the court conducts an expedited proceeding and only considers that evidence contained within the agency record, *see id.* at 1356 (discussing RCFC 56.1, the predecessor to today's RCFC 52.1), as properly supplemented by those materials necessary to "permit meaningful judicial review consistent with the APA," *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009).  "[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

With the above standards in mind, the court will address plaintiff's six counts in the following order.  First the court will address count (5), which contends that NASA failed to comply with the Space Policy.  This count does not challenge the substance of the SSA's source selection decision, but instead challenges the procedures that NASA employed prior to that decision.  Next, the court will address counts (3), (4), and (6).  Generally speaking, these counts attack the merits of the SSA's comparative analysis, i.e., those portions of the source selection decision in which the SSA articulated his reasons for concluding that Orbital's proposal was *better* than plaintiff's with regard to the non-price/technical evaluation factor, mission suitability.  Finally, the court will address counts (1) and (2).  These counts are inextricably linked and strike at the sufficiency of the SSA's trade-off analysis, i.e., the analysis leading the SSA to conclude that the additional benefits of Orbital's higher-priced proposal merit the additional cost.

## C. NASA Complied with the Space Policy's Requirements and with the RFP's OSTP-Consultation Requirement

### 1. NASA Complied with the Space Policy's Requirements

In count (5), plaintiff alleges that "Orbital's proposed configuration [did] not meet the U.S.-made requirements of the National Space Transportation Policy" and that "NASA did not obtain the required exemption from the Office of Science and Technology Policy" before making an award to Orbital.  Compl. ¶ 92.  Plaintiff's argument rests upon Section V(1)(a) of the Space Policy which states, in pertinent part:

> United States Government payloads shall be launched on *space launch vehicles manufactured in the United States*, unless exempted by the Director of the Office of Science and Technology Policy, in consultation with the Assistant to the President for National Security Affairs.

> * * *

> The *proposed use of a non-U.S.-manufactured launch vehicle* will be subject to interagency coordination as early in the program as possible and prior to the sponsoring department's or agency's request for authority to negotiate and conclude an agreement.

Space Policy Fact Sheet at 7 (emphases added).  The negative implication of this Section is clear: if a contractor proposes the use of a "launch vehicle manufactured in the United States," then the agency need *not* coordinate with, or seek an exemption from, OSTP.

Here, Orbital's proposed launch vehicle, the Taurus II, was the same launch vehicle that Orbital had proposed for use under a previous NASA contract, the Commercial Orbital Transportation Services ("COTS") development project.  AR 9829.  During the COTS procurement, an interagency working group led by OSTP—and joined by representatives from the Departments of Defense, Commerce, and State, the Federal Aviation Administration, and NASA—addressed the question of "whether the Taurus II vehicle should be eligible to launch U.S. Government (USG) payloads without additional waivers or exemptions in the context of Section V(1)(a) of the U.S. Space Transportation Policy."  AR 31791.  The working group noted that "the current Taurus II configuration involves a modified first stage engine originally manufactured in Russia and Ukrainian-manufactured first stage propellant tanks."  *Id.*  Nevertheless, the working group concluded:

> [T]he Taurus II launch vehicle as currently configured will be eligible to launch USG payloads without additional waivers or exemptions pursuant to Section V(1)(a) of the Space Transportation Policy, i.e. the currently proposed configuration of *the Taurus II will be treated as a space launch vehicle manufactured in the United States* for purposes of interpreting the applicability of this provision of the policy.

*Id.* (emphasis added).  The group did warn, however, that "[a]ny significant increase in non-U.S. components from [Orbital's] proposed level could necessitate further review."  *Id.*

In response to the instant procurement, Orbital represented that its "system is based on the launch and in-space vehicles . . . that will be demonstrated by the NASA/Orbital COTS demonstration project."  AR 9829.  Moreover, as required by the RFP, Orbital certified, "to the best of its knowledge and belief, that it is . . . using space vehicles manufactured in the United States in accordance with U.S. Space Transportation Policy."  AR 1972, 6424.  As described below, Orbital's certification fatally undermines plaintiff's argument under count (5).

In *Klinge Corp. v. United States*, Judge Bruggink was presented with a similar certification in a post-award bid protest action.  82 Fed. Cl. 127, 128 (2008).  Specifically, the RFP at issue in that case required offerors to certify their compliance with the Trade Agreements Act ("TAA"), 19 U.S.C. §§ 2501–82, by representing that each refrigeration system delivered under the contract would be a "U.S.-made, qualifying country, or designated country end product."  *Id.*  The plaintiff in *Klinge* alleged that the contract-awardee's refrigeration systems were principally manufactured in China, and thus, did not comply with the TAA.  *See id.* at 131–33.  In resolving the protest, Judge Bruggink noted that unless, prior to award, the procuring agency had reason to believe that the contract-awardee would provide a non-compliant product, the agency was entitled to rely upon the offeror's certification.[11]  *Id.* at 135.

---

[11] Ultimately, Judge Bruggink concluded that the procuring agency *did* have reason to believe that the contract-awardee would provide a non-compliant product, and accordingly, sustained the protest. *See id.* at 137–38.

This court believes that Judge Bruggink's reasoning, with regard to the TAA certification requirement in *Klinge*, applies with equal force to the instant case. Unless NASA had independent reason to believe that Orbital would provide a launch vehicle that did not comply with the Space Policy, the agency was entitled to rely upon Orbital's certification. *See id.* at 135. Plaintiff has not set forth any evidence[12] that Orbital proposed, or planned to use, any Taurus II configuration other than the one previously approved by the OSTP-led working group as being compliant with the Space Policy. And, significantly, even if Orbital did harbor a secret intent to increase the Taurus II's foreign content, such a change would be a matter of contract performance, not contract formation, i.e., a matter strictly between NASA and Orbital to be dealt with after performance of the contract begins. *See id.* (noting that a TAA certification contained within the winning offeror's proposal gives rise to a contractual obligation on the part of the offeror to provide a TAA compliant product). Because Orbital proposed using a U.S.-manufactured launch vehicle, and certified the same, the Space Policy did not require NASA to engage in any inter-agency consultation or to seek an exemption from OSTP, before making an award to Orbital. *See* Space Policy Fact Sheet at 7.

## 2. NASA Complied with the RFP's OSTP-Consultation Requirement

Plaintiff asserts that even if the Space Policy did not require consultation with OSTP, "NASA affirmatively committed to seek a determination from the OSTP whether launch vehicles qualified as U.S.-made." Pl.'s Reply at 17. Indeed, NASA did represent that it would "consult with OSTP about the application of the [P]olicy requirement to any specific proposal." AR 1503. Plaintiff alleges that NASA did not honor this representation. Pl.'s Reply at 17. Alternatively, plaintiff contends that, if NASA consulted with OSTP, such consultation was with an employee lacking authority to "make required decisions with respect to the Space Policy." Pl.'s Reply at 18–19.

Before the court can proceed with this discussion, it is necessary to resolve plaintiff's outstanding motion to supplement the administrative record. In its motion, plaintiff seeks to introduce 146 pages of material that it received in response to its August 31, 2009 Freedom of Information Act ("FOIA") request, asking OSTP to provide "any records memorializing or pertaining to [OSTP's] consideration of the application of the United States Space Transportation Policy to launch vehicles proposed to be used in connection with [the RFP]." Pl.'s Oct. 2, 2009 Mot., Ex. 1 at 2. Plaintiff offers this material not for its content, but to note that "OSTP's response did not contain a single document dating from or relating to that procurement, as opposed to the COTS procurement." Pl.'s Reply at 18 n.12. Presumably, the inference to be drawn from this lack of OSTP documentation is that NASA did not discuss Orbital's proposal with OSTP. *See* Pl.'s Reply at 18.

In deciding the instant motion, the court returns to the longstanding standard recently re-enunciated by the Federal Circuit. *Axiom*, 564 F.3d at 1381. In *Axiom*, the Circuit stated that supplementation of the administrative record is permissible only where omission of the extra-record evidence would "frustrate effective judicial review." *Id.* (quoting *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)). Here, it is important to note that the court is reviewing NASA's procurement

---

[12] *See PlanetSpace Inc.*, 90 Fed. Cl. at 8–9 (striking portions of plaintiff's prospective chief operating officer's declaration, because they were based upon unascribed hearsay and a news article that post-dated NASA's award decision).

actions, not the substance of OSTP's decision[13]—one likely beyond this court's authority to review. *Cf.* Oryszak v. Sullivan, 576 F.3d 522, 525 (D.C. Cir. 2009) (holding that Secret Service special agent failed to state a claim under the APA when challenging the Secret Service's revocation of her top secret clearance, because the revocation decision was, by law, wholly committed to the agency's discretion).   And NASA's procurement actions are entitled to a presumption of regularity, absent record evidence suggesting otherwise.   *See Impresa*, 238 F.3d at 1338 ("Because of [the] presumption of regularity, the agency should not be required to provide an explanation unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious."); *see also Madison Servs., Inc. v. United States*, No. 09-675, 2010 WL 1221304, at *9 (Fed. Cl. Feb. 3, 2010) ("A strong presumption of regularity and good faith conduct attaches to any rational agency decision.").   Therefore, if the administrative record demonstrates that NASA consulted OSTP about Orbital's proposal, then evidence that OSTP may not have documented this consultation or its own deliberations is of no moment.

The existing administrative record here amply demonstrates that NASA properly consulted OSTP.  Accordingly, plaintiff's motion to supplement the record must be denied.  On December 12, 2008, Lynn Cline of NASA prepared a "Memorandum for the Record" with the subject line: "Application of National Space Transportation Policy to the International Space Station (ISS) Commercial Resupply Services (CRS)."   AR 6316.   In the memorandum, Ms. Cline states, in pertinent part:

> I met with Damon Wells of OSTP on October 24, 2008, to discuss with him the applicability of this policy to the proposal that NASA had received from [Orbital] in response to the ISS CRS solicitation.  I had previously participated in an interagency review led by OSTP that concluded the Taurus II will be eligible to launch U.S. Government payloads.  The remaining issue was whether the definition as envisaged by the policy referred solely to the boost phase of the vehicle (i.e., the Taurus II launch vehicle) or if it also included the cargo transfer vehicle.

> Mr. Wells agreed that it was a reasonable interpretation that the policy refers to the launch vehicle and not the payload, in this case the cargo vehicle.  He also agreed that one reason for leaving this question open was to have the opportunity to see any proposals that might have raised broader questions, such as a fully foreign cargo transfer vehicle.  Further, he stated that NASA could proceed with its procurement activity and no interagency review would be required in this case.

*Id.*  Ms. Cline's memorandum is conclusive evidence that NASA indeed consulted OSTP, fulfilling NASA's self-imposed obligation under the RFP. *See also* AR 29279–85 (NASA memorandum with enclosures "for OSTP's assessment," documenting each offeror's proposed foreign content and each offeror's explanation of how it met the requirements of the Space Policy).

---

[13] At oral argument, the court inquired as to whether plaintiff was challenging the substance of OSTP's decision-making, i.e., whether OSTP's application of the Space Policy was arbitrary and capricious, or whether plaintiff's challenge was directed solely at NASA consultation with OSTP. Tr. 131–32. Plaintiff's counsel clarified that plaintiff is merely challenging whether NASA properly consulted OSTP.  Tr. 135–36.

Plaintiff's alternative argument that Mr. Wells lacked the requisite authority to interpret the Space Policy is also without merit. The parties do not dispute that Mr. Wells is a "senior policy advisor" within OSTP. *Compare* Pl.'s Mot. at 30, *with* Def.'s Reply at 12. Plaintiff's argument proceeds on the assumption that the "Space Policy assigns responsibility for administering the U.S.-made launch vehicle requirement to the Director of OSTP." Pl.'s Mot. at 30. In fact, the Space Policy does no such thing. The Space Policy makes only one reference to the OSTP director, where it states: "United States Government payloads shall be launched on space launch vehicles manufactured in the United States, *unless exempted* by the Director of the Office of Science and Transportation Policy, in consultation with the Assistant to the President for National Security Affairs." Space Policy Fact Sheet at 7 (emphasis added). In other words, the Space Policy merely vests in the OSTP director the authority to grant an exemption; it was entirely reasonable, and consistent with the requirements of the Space Policy and the RFP, for NASA to rely on the counsel of a "senior policy advisor" for the conclusion that no such exemption was necessary.[14]

Finally, the court briefly addresses plaintiff's contention that Mr. Wells did not decide whether Orbital's proposed cargo vehicle should be treated as part of the launch vehicle for purposes of the Space Policy. Pl.'s Mot. at 31. This is a curious argument, considering that Ms. Cline's memorandum states: "Mr. Wells agreed that it was a reasonable interpretation that the policy refers to the launch vehicle and not the payload, in this case the cargo vehicle." AR 6316. The subsequent sentence, upon which plaintiff's argument rests, provides: "[Mr. Wells] also agreed that one reason for leaving this question open was to have the opportunity to see any proposals that might have raised broader questions, such as a fully foreign cargo transfer vehicle." *Id.* However, this sentence is merely recounting why OSTP left this question open in past interpretations of the Space Policy, and does not contradict Mr. Wells' conclusion in the previous sentence that the Space Policy does not apply to Orbital's cargo vehicle. In sum, this court concludes that all of plaintiff's arguments under count (5) are without merit.

## D. The SSA Did Not Apply an Unstated Evaluation Criterion to Plaintiff's Proposal Alone

In count (3), plaintiff alleges that "[t]he [SSA's] decision to select Space-X and Orbital for awards was arbitrary and capricious, lacks a rational basis, and is factually unsupported because it imposed unstated and irrational requirements on the unsuccessful offeror, PlanetSpace." Compl. ¶ 73. On this point, the source of plaintiff's discontent is the following statement found within the SSA's decision: "[A]lthough one was not required by the solicitation, I was concerned that the proposal did not contain a backup plan in the event one of the major subcontractors was unable to perform given the sizable amount of responsibilities PlanetSpace proposed to place at the subcontractor level." AR 5176. Plaintiff contends that this is an admission by the SSA that he impermissibly applied an unstated evaluation criterion, specifically a "back-up plan" requirement, to plaintiff's proposal alone. Compl. ¶ 76.

---

[14] Assuming, *arguendo*, that the Space Policy could be interpreted as assigning the OSTP Director the exclusive authority to administer the U.S.-made launch vehicle requirement, there is no reason to believe that the Director did not delegate that authority, pursuant to 42 U.S.C. § 6616(c), to his senior policy advisor, Mr. Wells. Again, absent record evidence suggesting otherwise, an agency's actions are entitled to a presumption of regularity. *See Impresa*, 238 F.3d at 1338.

"It . . . is beyond peradventure that the government may not rely upon undisclosed evaluation criteria in evaluating proposals." *NEQ, LLC v. United States*, 88 Fed. Cl. 38, 48 (2009); *see* 10 U.S.C. § 2305(b)(1) ("The head of an agency shall evaluate . . . competitive proposals and make an award based solely on the factors specified in the solicitation."); FAR 15.303(b)(4) ("The [SSA] shall . . . [e]nsure that proposals are evaluated based solely on the factors and subfactors contained in the solicitation."). Moreover, agencies must apply the stated evaluation factors in a fair and even-handed manner across competing proposals. *See RJO Enters., Inc.*, B-260126 *et al.*, 95-2 CPD ¶ 93, at *6 (Comp. Gen. July 20, 1995) ("[A]n agency may not disparately evaluate offerors' proposals with respect to the same requirements."); *Sci-Tec Guaging, Inc.*, B-252406 *et al.*, 93-1 CPD ¶ 494, at *5 (Comp. Gen. June 25, 1993) (same); *see also* FAR 1.602-2(b) ("Contracting officers shall . . . [e]nsure that contractors receive impartial, fair, and equitable treatment."). Nevertheless, a solicitation need not identify criteria intrinsic to the stated evaluation factors, and agencies retain "great discretion" in determining the scope of a given evaluation factor. *NEQ*, 88 Fed. Cl. at 48. Accordingly, for a plaintiff to succeed on a claim of undisclosed evaluation criteria, it must show that the procuring agency used a "significantly different basis in evaluating the proposals than was disclosed" in the solicitation. *Id.*; *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 387 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

Here, the RFP identified "management plan" or "management approach" as one of the three evaluation subfactors that NASA was to consider when judging proposals. AR 2089, 2091. Specifically, the RFP stated that an offeror's management approach would be evaluated for "effectiveness, clarity, comprehension, feasibility, realism, suitability, *risk* and soundness." AR 2091 (emphasis added). The RFP further explained that "NASA [would] evaluate the offeror's proposed management team for key positions; the *teaming arrangements* and completeness in meeting key aspects of the [Statement of Work]; and the overall effectiveness and completeness of the management approach, plan, and processes." *Id.* (emphasis added). In sum, NASA notified offerors that it would examine any proposed teaming arrangements and assess them for potential performance risk.

While it is problematic for the SSA to begin a sentence in his source selection decision with the phrase "although one was not required by the solicitation," all but inviting a bid protest, the court finds that the SSA did not apply a "back-up plan" requirement as an unstated evaluation criterion. The SSA made the questionable statement in the context of his critique of plaintiff's management plan—a plan that was unique among offerors in how heavily it relied upon the timely performance of its subcontractors. *See, e.g.*, AR 5176 ("I believed [PlanetSpace's] subcontracting structure . . . represented a significant risk to the successful performance of the program"). Plaintiff concedes that its proposal called for it to subcontract "design, development, production, and operation of space services." Pl.'s Mot. at 7. Given plaintiff's proposed reliance on subcontractors for such key portions of the work required by the RFP, it was not irrational for the SSA to conclude that plaintiff's proposal carried an added degree of performance risk. *See Davies Rail & Mech. Works, Inc.*, B-278260 *et al.*, 98-1 CPD ¶ 134, at *8 (Comp. Gen. Feb. 25, 1998) ("Here, the [Navy] reasonably concluded that Davies's use of subcontractors to perform the majority of the work required under the RFP represented an approach which, because of the fragmentation of services,

presented greater risk for the agency."). A back-up plan might have mitigated this risk, but plaintiff did not present one.[15] The SSA more artfully explained his reasoning later in his decision:

> I was also concerned that the proposal did not contain a backup plan in the event one of the major subcontractors was unable to perform its sizable responsibilities under this proposal. I concluded the subcontracting team proposed by Orbital had a much smaller role since that team amplified Orbital's extensive in-house expertise in specific areas of the CRS requirements as opposed to being responsible for most of the technical aspects of the proposal as was the case with PlanetSpace.

AR 5180. In other words, only plaintiff's proposal presented this type of subcontractor performance risk, and therefore, only plaintiff's proposal would have benefitted from a back-up plan. This explains why the SSA's discussion of a back-up plan was limited to plaintiff's proposal alone. Moreover, the SSA's comments were made within his broader evaluation of plaintiff's proposed teaming arrangement. Accordingly, this court cannot conclude that the SSA used a "significantly different basis in evaluating the proposals than was disclosed" in the RFP. *NEQ, LLC*, 88 Fed. Cl. at 48. Rather, the court finds that the SSA's discussion of a back-up plan (or lack thereof) was a proper application of the RFP's evaluation factors, which plainly notified plaintiff that NASA would examine its proposed teaming arrangement for potential performance risks.

### E. The SSA's Evaluation of Plaintiff's Past Performance Was Not Irrational or Contrary to Law

In count (4), plaintiff focuses on the SSA's evaluation of its past performance. Compl. ¶¶ 81–86. By default,[16] agencies must consider offerors' relevant past performance (i.e., its record of performance under previously awarded contracts) in negotiated procurements expected to exceed $100,000. *See* FAR 2.101; FAR 15.304(c)(3)(i); FAR 42.1501. If the agency concludes that the offeror possesses no relevant past performance, the agency may not evaluate the offeror "favorably or unfavorably on past performance." FAR 15.305(a)(2)(iv). The FAR further provides that the SSA "should take into account past performance information regarding . . . key personnel who have relevant experience, or subcontractors that will perform major or critical aspects" of the contract. FAR 15.305(a)(2)(iii).

Here, the RFP stated that offerors' past performance would not be evaluated separately, but "as part of each Mission Suitability Subfactor." AR 2090. NASA further notified offerors that "[f]irms . . . submitting a proposal as a prime-subcontractor relationship [would] be evaluated on the combined past performance of each company involved in the proposal." AR 3587, 3642, 3700.

---

[15] Plaintiff claims that it "was the only offeror that actually did have a back-up plan," the Atlas V launch vehicle. Pl.'s Reply at 15. In truth, plaintiff did not present the Atlas V as a back-up plan, but as an interim measure until it could develop the Athena III. *See* AR 10459, 10787–90. According to plaintiff's proposal, the Atlas V would be used only for the first mission contemplated by the RFP. *See* AR 10459, 10787–90.

[16] "Past performance need not be evaluated if the contracting officer documents the reason past performance is not an appropriate evaluation factor for the acquisition." FAR 15.304(c)(3)(iii).

Plaintiff is a relatively new business entity, with little or no relevant past performance of its own.  *See* AR 11021–62 (plaintiff's final proposal identifying both its relevant contracts and the relevant contracts of its subcontractors).  Nevertheless, the SEB assigned plaintiff's proposal three "significant strengths" based upon the past performance of plaintiff's subcontractors and key personnel.  AR 4960, 4974 (SEB Findings 200, 260 and 282).  For example, in evaluating plaintiff's technical approach, the SEB concluded:

> The excellent past performance of the PlanetSpace subcontractors on numerous highly relevant NASA and Department of Defense contracts greatly enhances the likelihood of successful performance on the Commercial Resupply Services (CRS) contract due to their direct and successful experience in launch and orbital vehicle development, International Space Station (ISS) mission and cargo integration, and flight procedure development.

AR 4960 (SEB Finding 200).   The SEB took the same approach in evaluating plaintiff's management plan, noting that "[t]he PlanetSpace management team's key personnel and subcontractors . . . were rated excellent in past performance and possess highly relevant experience in areas related to the [Statement of Work] which leads to [a] high potential for success."  AR 4974 (SEB Finding 260).

The SSA, however, disagreed with the SEB's analysis entirely, finding that the past performance of plaintiff's subcontractors and key personnel was "not relevant for purposes of selection."  AR 5175–76.  The SSA explained:

> The SEB indicated that [Finding 200] was based upon the past performance of subcontractors and not on PlanetSpace's experience.  The SEB cannot give PlanetSpace negative past performance, per the FAR, because it had little or no relevant experience, itself, as a prime contractor.  I concurred the SEB could not give an offeror a negative evaluation because it had little or no Past Performance; however, I disagreed with the SEB assessment that this finding was a significant strength.  I determined the significance of this finding was offset by PlanetSpace's lack of experience in development, production and operation of large, complex space systems and, therefore, concluded this finding was not relevant for purposes of selection.

> * * *

> The SEB gave PlanetSpace's proposal three significant strengths in the area of Management: for its management team's key personnel and subcontractors (Finding 260); for providing additional information on and augmenting its teaming arrangement (Finding 282); and a strength for having an exceptionally effective and complete Safety and Health Plan (Finding 273).  I concluded findings 260 and 282 were offset as being discriminators for selection because of the absence of a corresponding strength regarding the prime contractor's abilities to perform the contract.  It can be a significant strength to have strong subcontractors: however, I did not believe these findings should be discriminators for selection when almost all of the technical expertise appeared to reside at the subcontractor level.

*Id.*

Plaintiff contends that the above passages demonstrate that the SSA impermissibly adopted and applied an unstated evaluation criterion to plaintiff's proposal alone when he failed to give plaintiff credit for its subcontractors' and key personnel's past performance. Compl. ¶¶ 85–86. In plaintiff's words, "[t]here is no requirement of a corresponding strength set forth anywhere in the [RFP], regulation, or statute, in order that subcontractor past performance be counted in an overall evaluation." Compl. ¶ 85. Plaintiff further alleges that the SSA impermissibly penalized plaintiff for its lack of relevant past performance as a prime contractor, contrary to FAR 15.305(a)(2)(iv). *Id.*

At the outset, it is important to note that what does or does not constitute "relevant" past performance falls within the SSA's considered discretion. *See* FAR 15.305(a)(2)(ii) ("The [SSA] shall determine the relevance of similar past performance information."). This discretion explains, in part, why the FAR provides that the SSA "*should*," not must, "take into account past performance information regarding . . . key personnel . . . or subcontractors." FAR 15.305(a)(2)(iii) (emphasis added). The Office of Federal Procurement Policy's ("OFPP") guidance to agencies is in accord, encouraging agencies to consider the past performance of key management personnel and subcontractors to "reduce[] the chance of needing to neither reward nor penalize an offeror with no other relevant past performance information" under FAR 15.305(a)(2)(iv). *Best Practices for Collecting and Using Current and Past Performance Information*, ch. 3 (Office of Fed. Procurement Policy, et al. 2000) (internal quotation marks omitted).[17] Tellingly, OFPP's guidance concludes: "There are various methods that may be used to evaluate a competitive offeror with no past performance history and *it is at the discretion of the agency to determine the most appropriate method on a case-by-case basis*." *Id.* (emphasis added). Indeed, as recently as 1997, the FAR Council considered and rejected a proposed change to FAR 15.305 that would have limited the SSA's discretion on this point. FAR Part 15 Rewrite, 62 Fed. Reg. 51224-01, 51226 (Dep't of Defense, et al. Sept. 30, 1997). The proposed change would have required agency procurement officials to consider the past performance of an offeror's key personnel and subcontractors as the offeror's own, thus precluding the possibility of the offeror receiving a neutral rating for past performance.[18] *Id.*

Given the "especially great discretion" that contracting officials enjoy in the context of negotiated procurements—discretion that extends to the application of relevant procurement regulations such as FAR 15.305, *Am. Tel. & Tel. Co. v. United States*, 307 F.3d 1374, 1379 (Fed. Cir. 2002)—this court cannot say that the SSA's conclusions regarding plaintiff's past performance were irrational or contrary to law. As stated above, FAR 15.305 does not compel the SSA to consider key personnel and subcontractor past performance. Moreover, while it would have been reasonable for the SSA to agree with the SEB and to conclude that the past performance of

---

[17] *Available at* http://www.whitehouse.gov/omb/rewrite/procurement/contract_perf/best_practice_re_past_perf.html.

[18] The proposed rule, proffered by the American Bar Association's Section of Public Contract Law, stated: "A neutral past performance rating shall be used for offerors that do not have any relevant past performance. An offeror whose predecessor companies, relevant affiliates, key personnel or major subcontractors have relevant past performance information shall not receive a neutral past performance rating but shall receive a rating appropriate to such parties." John S. Pachter et al., *The FAR Part 15 Rewrite*, 98-05 BRIEFING PAPERS 1, 11 (1998).

plaintiff's key personnel and subcontractors was relevant and in plaintiff's favor, it was also reasonable for the SSA to conclude otherwise, given plaintiff's own lack of past performance. *See Banknote Corp. of Am.*, 56 Fed. Cl. at 387 (dismissing disappointed offeror's contention that an agency improperly relied on an unstated evaluation factor when it considered the offeror's lack of prime contracting experience in reaching its source selection decision); *IPlus, Inc.*, B-298020 *et al.*, 2006 CPD ¶ 90, at *7 (Comp. Gen. June 5, 2006) (stating that an agency need not substitute a subcontractor's experience or past performance for that of a prime contractor that lacks past performance of its own); *J.A. Farrington Janitorial Servs.*, B-296875, 2005 CPD ¶ 187, at *4 (Comp. Gen. Oct. 18, 2005) ("We see nothing improper in the agency focusing, in particular, on the prime contractor's lack of past performance, given that it is the entity responsible for performing the contract, even where its . . . subcontractor has considerable positive past performance."). This court cannot displace the SSA's reasonable conclusion merely because it has identified an alternate conclusion that might have been likewise reasonable, or even preferable. *See Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."); *Madison Servs.*, 2010 WL 1221304, at *7 ("It is axiomatic that the demonstrated rationality of one possible conclusion does not negate the rationality of the alternative or even opposite conclusion."). "After all, reasonable minds can and do differ." *Madison Servs.*, 2010 WL 1221304, at *7.

Accordingly, this court finds that the SSA did not employ an unstated evaluation criterion in the assessment of plaintiff's past performance. Rather, the SSA reasonably concluded that the past performance of plaintiff's key personnel and subcontractors was "not relevant for purposes of selection." AR 5175–76. Moreover, by concluding that the past performance of plaintiff's key personnel and subcontractors was not relevant, the SSA did not penalize plaintiff for its lack of past performance as a prime contractor. Instead, the SSA correctly assigned plaintiff the equivalent of a neutral rating, evaluating plaintiff neither "favorably [nor] unfavorably on past performance," in accordance with FAR 15.305(a)(2)(iv). Therefore, the SSA's evaluation of plaintiff's past performance was not irrational or contrary to law.

## F. The SSA's Assignment of Significant Weaknesses to Plaintiff's Proposal Was Reasonable

Plaintiff contends, under count (6), that the SSA assigned significant weaknesses[19] to plaintiff's proposal that were without factual support and, thus, irrational. Compl. ¶¶ 98–106. Plaintiff faults two of the SSA's findings in particular: (1) the SSA's risk assessment of plaintiff's cost-reimbursement subcontracts, Pl.'s Mot. at 32–33; and (2) the SSA's purported conclusion that plaintiff would not be "'cash flow positive' until 'nearly' the end of the contract." Pl.'s Mot. at 33 (quoting AR 5177).[20]  Both of plaintiff's contentions are without merit.

---

[19] A "significant weakness" is defined as "a flaw [in the proposal] that appreciably increases the risk of unsuccessful contract performance." FAR 15.001.

[20] Plaintiff also asserts in its complaint that the SSA failed to consider the impact of whether or not an "early mission" was required by the RFP when evaluating plaintiff's proposal for potential risks. Compl. ¶¶ 104–05. Plaintiff does not cite any evidence for this contention and does not return to this point in its briefs. Accordingly, the court interprets plaintiff's briefs as abandoning this argument.

First, plaintiff asserts that "[t]he SSA's conclusion that the PlanetSpace proposal posed undue financial risk was principally based on his belief that 'much of the work would be performed on large subcontracts on a cost reimbursement basis,' when in fact 83% of the subcontracted effort was to be performed on a fixed-price basis." Pl.'s Reply at 20–21 (quoting the SSA's decision at AR 5179). Plaintiff's argument is factually correct, *see* AR 31781, but strikes the court as splitting hairs. The phrase quoted by plaintiff echoes a concern articulated more explicitly elsewhere in the SSA's decision. There, the SSA stated: "I believed it was extremely risky for PlanetSpace to have a fixed-price contract with NASA when most of the effort *in the early stages of the contract* would be performed under cost type subcontracts." AR 5176 (emphasis added). Plaintiff's own proposal identified these subcontracts as posing a risk of "significant schedule delays and cost over runs" absent effective controls. AR 10581. The parties agree that these subcontracts constituted 30% of plaintiff's early development effort. *Compare* Pl.'s Reply at 21 n.14, *with* Def.'s Resp. at 42–43. The SSA recognized that plaintiff's final proposal included various incentives and cost controls[21] to mitigate these risks, but he nevertheless remained skeptical. AR 5176. Whether 17% of the total subcontracting effort or 30% of the development effort can be properly characterized as "much of the work" is quite beside the point. *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) (declining to "second guess" the "minutiae of the procurement process"). The SSA reasonably assigned plaintiff a significant weakness on the basis that PlanetSpace's proposed "subcontracting structure . . . represented a significant risk to the successful performance of the program." AR 5176.

Plaintiff's second contention—that the SSA was factually incorrect in concluding that plaintiff would not be "'cash flow positive' until 'nearly' the end of the contract," Pl.'s Mot. at 33 (quoting AR 5177)—inaccurately quotes the SSA's decision. While it is true that plaintiff projected it would be "cash flow positive" (i.e., income would exceed expenditures on a year-over-year basis) within two years of flying its first mission, *see* AR 10590, the term "cash flow positive" does not appear in the SSA's decision, *see* AR 5165–82. What the SSA, in fact, wrote was that plaintiff "did not project it would reflect *positive cumulative cash from operations* until nearly the end of the contract." AR 5177 (emphasis added). Plaintiff's own chart undeniably supports this statement, illustrating that positive cumulative cash from operations (i.e., a profit on the contract) was not expected until 2015. AR 10590.

Plaintiff's remaining arguments under this count either amount to nothing more than trivial disagreements with the SSA's reasoned judgment or repeat contentions forwarded and dismissed by the court in the discussion of earlier counts. In sum, this court finds no fault with the portion of the SSA's analysis that plaintiff challenges under count (6). The court thus concludes that the SSA provided a reasonable basis for disagreeing with the SEB and concluding that Orbital's proposal was comparatively *better* than plaintiff's under the non-price/technical evaluation factor, mission suitability. Unfortunately, as explained below, the court is unable to reach the same conclusion at this time regarding the merits of the SSA's trade-off analysis.

---

[21] *See* AR 10607–08 (plaintiff's proposed risk mitigation plan).

**G. Without Further Agency Explanation, the Court Cannot Determine Whether the SSA Made a "*De Facto*" Non-Responsibility Determination or Whether the SSA Performed a Legally Sufficient Trade-Off Analysis**

Under count (2), plaintiff alleges that the SSA failed to conduct a proper trade-off analysis when selecting Orbital's technically superior, but significantly higher-priced proposal,[22] for a second contract award.  Compl. ¶¶ 63–70.  Plaintiff asserts under count (1), that the SSA made a number of "*de facto*" non-responsibility determinations in his decision, which determinations he "simply lacked the legal authority to make."  Compl. ¶¶ 47–61.  At the heart of both of these claims lies this enigmatic statement of the SSA: "Although I recognized the evaluation criteria provided that Mission Suitability was more important than price, I could not conduct a 'typical' trade-off analysis since I believed there was a low likelihood PlanetSpace could successfully perform the contract." AR 5181.  The sentence begins on a note of confusion,[23] and, as described below, ends in discordant ambiguity.

In response to plaintiff's arguments, and in an effort to clarify the ambiguity contained within the SSA's source selection decision in its favor, intervenor-defendant Orbital invites the court to rely on the SSA's testimony before GAO.  *See* Orbital's Reply at 10 n.2.  However, even taking into account the SSA's GAO testimony, the court is unable to divine what the SSA was attempting to convey.  Accordingly, the court withholds judgment on counts (1) and (2) and remands to the agency for further explanation.

**1. The SSA's Documented Trade-Off Analysis**

The instant procurement was to be conducted using the best value trade-off process described at FAR 15.101-1.  AR 2089.  This process "permits tradeoffs among cost or price and non-cost factors and allows the Government to accept other than the lowest priced proposal."  FAR 15.101-1(c).  While the solicitation may state that the non-cost evaluation factors are more important than cost or price, FAR 15.304(e)(1)—as it does here, AR 2089—cost or price must remain a meaningful factor in the SSA's decision-making, *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 959 (Fed. Cir. 1993); *see* 41 U.S.C. § 253a(c)(1)(B) ("an executive agency shall include cost or price . . . as an evaluation factor that must be considered in the evaluation of proposals").  Should the SSA ultimately select the higher-priced proposal, the "perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for [the SSA's] tradeoffs must be documented." FAR 15.101-1(c).  This "documentation shall include the rationale for any business judgments and tradeoffs made or relied upon by the SSA, including the benefits associated with additional costs." FAR 15.308.  In other words, the SSA is required to conduct and document a form of cost-benefit analysis.

Cost-benefit analysis ("CBA") is a decision-making paradigm that dates back more than 160 years.  *See* Jules Dupuit, *On the Measurement of the Utility of Public Works*, 2 INT'L ECON. PAPERS (R.H. Barback trans., 1952) (1844).  Over the past thirty years, a series of Executive Orders, along

---

[22] *See supra* note 7.

[23] The RFP's statement that "Mission Suitability is more important than Price," AR 2089, supports, rather than undermines, the SSA's ultimate conclusion.

with several statutes and court decisions, have cemented CBA as a primary decision-making tool for federal agencies.  *See, e.g.*, 1 ADMIN. L. & PRAC. § 4.51 (2d ed. 2009) (citing Executive Orders issued by Presidents Reagan, Clinton, and Bush); Robert H. Frank and Cass R. Sunstein, *Cost-Benefit Analysis and Relative Position*, 68 U. CHI. L. REV. 323, 323–24 (2001) (citing the same Executive Orders, along with statutes and court decisions, and noting a convergence among federal agencies upon a "default rule in favor of cost-benefit analysis").

The normative goal of CBA is simple: a given project should be pursued only if its benefits exceed its costs, as measured relative to the status quo or to competing projects.  *See* Matthew D. Adler & Eric A. Posner, *Rethinking Cost-Benefit Analysis*, 109 YALE L. J. 165, 170, 178–79, 183 (1999) [hereinafter Posner, *Rethinking Cost-Benefit Analysis*]; A. R. Prest and R. Turvey, *Cost-Benefit Analysis: A Survey*, 75 ECON. J. 683, 685–86 (1965).  Fundamentally, CBA is "an accounting framework in which benefits and costs associated with decisions are set out for purposes of information and discussion."   Jonathan Lesser & Richard O. Zerbe, *A Practitioner's Guide to Benefit-Cost Analysis*, *in* HANDBOOK OF PUBLIC FINANCE, 221, 221 (Frederick Thompson & Mark T. Green eds., 1998).  Defined more narrowly, CBA involves quantifying costs (including *foregone* benefits) and benefits (including *avoided* costs) associated with a given project in terms of a common metric, typically a dollar value, so that a precise measure of the project's *net* impact may be derived.  *See* Posner, *Rethinking Cost-Benefit Analysis* at 170, 180–81.  Only where this net impact is positive should the project under consideration be pursued.[24]

A number of practical and theoretical considerations may complicate any rigid implementation of this idealized analysis.  *See, e.g.*, 1 ADMIN. L. & PRAC. § 4.53 (2d ed. 2009); Posner, *Rethinking Cost-Benefit Analysis* at 178–87.  This is why most scholars in the field promote a less-demanding "soft" CBA test for government decision-making, which recognizes that some costs and benefits may not be easily quantified, and which demands only that such costs and benefits be considered in the final analysis.  John D. Graham, *Saving Lives Through Administrative Law and Economics*, 157 U. PA. L. REV. 395, 433 (2008) [hereinafter Graham, *Saving Lives*].  Such an approach requires only that an agency demonstrate that a proposed project's benefits justify, rather than quantitatively exceed, its costs.  *See id.* at 433, 437–38.  In other words, "CBA methods cannot be applied mechanically," though "agencies can use them to guide judgment in a way that rationalizes and clarifies agency action."  Posner, *Rethinking Cost-Benefit Analysis* at 247.  Indeed, under the "soft" test described above, a government decision-maker would be permitted to embark on a project "with quantified benefits that are less than [its] quantified costs if a reasonable case [can be] made that qualitative considerations are compelling enough to justify the proposal."  Graham, *Saving Lives* at 433.

Consider the decision-maker's dilemma in the shadow of uncertainty.  When the benefits of a project lie in the future, the decision-maker must take due account of the associated risk, i.e., the probability that the project's benefits will never materialize.  1 ADMIN. L. & PRAC. § 4.53 (2d ed. 2009).  When feasible, a decision-maker may take account of risk by multiplying an estimate of the future value of the project's benefits by their probability of occurrence, in order to obtain the *present*

---

[24] This brief overview of CBA is decidedly incomplete, though sufficient for the court's purposes. *See* Posner, *Rethinking Cost-Benefit Analysis* at 177 (citing ROBIN BOADWAY & NEIL BRUCE, WELFARE ECONOMICS 26–27, 292–328 (1984); E.J. MISHAN, COST-BENEFIT ANALYSIS (1976); AJIT K. DASGUPTA & D.W. PEARCE, COST-BENEFIT ANALYSIS: THEORY AND PRACTICE (1972)).

or "expected value" of these benefits.  *Id.*; Richard O. Zerbe & Allen S. Bellas, A Primer for Benefit-Cost Analysis 260–61 (Edward Elgar Publishing, Inc. 2006).

To illustrate the point, consider the following hypothetical scenarios, where two competing projects promise *identical* future benefits.  In the first, or high-risk, scenario, both projects, A and B, are unlikely to deliver the promised benefits, presenting a chance of success of only 30% and 20%, respectively.  The additional 10% chance of success that project A provides is immensely valuable in this case: it represents a 50% relative increment in expected value.  In the second, or low-risk, scenario, projects A and B have relatively high chances of success of 90% and 80%, respectively.  In this instance, the additional 10% chance of success, which project A promises, amounts to a far smaller increment in expected value of approximately 12%.  All other considerations aside, the decision-maker would be willing to pay 50% more for proposal A in the high-risk scenario, but only 12% more in the low-risk scenario.  *See, e.g.*, 1 Admin. L. & Prac. § 4.53 (2d ed. 2009); Zerbe & Bellas, *supra*, at 260–61 (providing similar examples of calculating and comparing expected values).

Once the decision-maker identifies a disparity in risk between competing projects, then the decision-maker should be willing to pay increasingly higher price premiums for the less risky project as the projects rise in future value.  Assume that each of our hypothetical projects, A and B, promises a future value of $1,000.  Under either the high or low-risk scenario, the decision-maker should be willing to pay a premium of up to $100 for project A, which promises an additional 10% chance of success.  If the future value of each project were to increase to $100,000,000, however, then project A would merit a price premium of $10,000,000.  Should the future benefits of the competing projects increase in value such that they become critical or necessary to the decision-maker, then theoretically even a 1% disparity in risk can justify payment of a seemingly extraordinary price premium for the project that promises marginally surer results.  The presence of risk can thus greatly impact the decision-maker's valuation of the relative benefits and justifiable costs of competing projects.

In the government procurement context, *Overstreet Electric Co. v. United States*, 59 Fed. Cl. 99 (2003), provides an example of these concepts.  In *Overstreet*, this court upheld—based on the critical nature of the services being procured—an agency's trade-off analysis that selected a contractor evaluated as posing no risk of failure over a contractor evaluated as posing little risk of failure but offering an approximately $200,000, or 10%, price advantage.  59 Fed. Cl. at 104–05, 119–20.  *Overstreet* is an example of the low-risk scenario above, in which the chance of successful contract performance is high for both proposals.  Thus, based on the magnitude of risk alone, one would have expected price to play a dominant role in the agency's source selection in that case.  Nevertheless, due to the importance of the contract's expected benefits, the agency's selection of the marginally lower-risk contractor at a not insignificant price premium was deemed rational by the court.  *Id.*

To be sure, the FAR does not, nor did the court in *Overstreet*, require government selection officials to perform a formal or precise calculus such as the court illustrates in the hypotheticals above; indeed, the FAR *expressly disavows* such a requirement.  Most notably, FAR 15.308 provides that "[a]lthough the rationale for the selection decision must be documented, that documentation *need not quantify* the tradeoffs that led to the decision." (emphasis added).  In other words, the SSA is not required to document "an exact dollar value" for each technical benefit contained within a

proposal. *Serco, Inc. v. United States*, 81 Fed. Cl. 463, 497 (2008) (citing *Widnall v. B3H Corp.*, 75 F.3d 1577, 1580 (Fed. Cir. 1996)).

FAR 15.101's "best value continuum" is nevertheless clearly informed by the CBA framework and concepts outlined above. "For example," FAR 15.101 begins, "in acquisitions where . . . the risk of unsuccessful performance is minimal, cost or price may play a dominant role in source selection." This hypothetical illustrates the low-risk scenario above, where all competing proposals promise a likelihood of success, and differences in risk between proposals ordinarily will justify only marginal differences in cost to the government. By contrast, where there is "greater . . . performance risk," non-cost or price factors "may play a dominant role in source selection." FAR 15.101. This second hypothetical focuses procurement officials' attention away from cost or price, where the chance of successful contract performance for all proposals is low and where differences in risk between competing proposals should substantially increase the price premium the government is willing to pay for the less risky proposal.

Returning to the instant case, under the heading "Trade-off Analysis" in the source selection decision, the SSA stated that Orbital's proposal was "superior" to plaintiff's "due to the serious Management risks inherent in the PlanetSpace proposal." AR 5181. The SSA "recognized [that] PlanetSpace had a lower overall price than the Orbital proposal," but otherwise did not discuss the magnitude of the price difference between the competing proposals. *Id.* The SSA concluded his discussion with the assertion that, in selecting Orbital's proposal, he "could not conduct [a] 'typical' tradeoff analysis since [he] believed there was a low likelihood PlanetSpace could successfully perform the contract." *Id.* This is the only section of the source selection decision that provides any *explicit* documentation of a trade-off analysis and it spans but a single pertinent paragraph.[25] *Id.* This section of the SSA's decision also lacks any explanation of what the SSA meant by a "typical" trade-off analysis. *Id.*

However, throughout his decision, the SSA repeatedly articulated concerns about the nature and degree of risk posed by plaintiff's proposal. *See, e.g.*, AR 5175 ("PlanetSpace was the only offeror that proposed a configuration requiring verification and integration of its orbital vehicle with two launch vehicles to meet the requirements of CRS, which potentially increases the technical and schedule risk to NASA."); AR 5180 ("Based on my assessment of the complexity and interplay of PlanetSpace's technical and management risks, I had much higher confidence in Orbital's ability to provide resupply services on a fixed-price basis."); *see also* discussion, *supra*, pp. 16–18, 21–22. When the SSA's source selection decision is viewed through the lens of the CBA framework outlined above, the perceived difference in performance risk between plaintiff and Orbital's proposals acquires new significance.

In his declaration, the SSA stated that the chance of successful contract performance is relatively low for all of the competing proposals. *See* Declaration of Gerstenmaier ¶ 16 ("The CRS Contract Awardees, Orbital and Space-X, are providing new space vehicles in an industry that has a high failure rate on new launch vehicles."). Moreover, the SSA noted that contract awardees are

---

[25] The section titled "Trade-Off Analysis," in fact, spans three paragraphs. AR 5181. However, the first paragraph explains the SSA's understanding that he need not document a trade-off analysis in selecting Space-X for contract award, and the third paragraph documents the SSA's rationale for making two, instead of one, contract awards. *Id.*

expected to deliver such necessary cargo as "air, food, clothing, medicine [and] spare parts" to the ISS.  Declaration of Gerstenmaier ¶ 17.  In other words, the cargo service that contract awardees will provide is "mandatory for effective ISS utilization."  Declaration of Gerstenmaier ¶ 6.  Should the awardees fail to timely deliver NASA's critical cargo, "the [United States] will not be able to fulfill its international agreements and [it] could adversely impact the future of further International Space Exploration initiatives."  Declaration of Gerstenmaier ¶¶ 19–20.  Given the high-risk and critical nature of the procurement, even marginal differences in risk between the competing proposals could justify paying a significant price premium for the less risky proposal.  *See Overstreet*, 59 Fed. Cl. 119–20; *see also Entz Aerodyne, Inc.*, B-293531, 2004 WL 437477, at *1–4 (Comp. Gen. Mar. 9, 2004) (upholding trade-off analysis that selected a contractor evaluated as "very low risk" over a contractor evaluated as posing "moderate risk" at a 40% price premium due to the importance of the goods being procured—power switching units "critical to [the] maintenance and repair of vehicles used in Operation Enduring Freedom and Operation Iraqi Freedom").  One can imagine that, in this case, the SSA thought that the disparity in risk between plaintiff's and Orbital's competing proposals was so great, and the nature of the services being procured so critical, that almost no price advantage could justify selecting plaintiff's riskier proposal.

In short, there is evidence that the instant procurement tasked the SSA to secure a critical future benefit for the government, and presented him with a choice between two high-risk alternatives that, in turn, were separated by a high relative disparity in risk.  In that circumstance, in the SSA's considered judgment, the balance of the trade-off between Orbital's and plaintiff's proposals *may* well have weighed *heavily and patently* against plaintiff, despite plaintiff's self-described "whopping" price advantage.[26]  This would explain the SSA's cursory explanation of his non-"typical" trade-off analysis.

### 2. The SSA's Alleged "*De Facto*" Non-Responsibility Determination

On the other hand, there is evidence suggesting that the SSA *may* have failed to perform a trade-off analysis altogether.  The SSA's decision arguably questioned plaintiff's ability to perform the proposed contract, not merely the soundness of the proposal itself.  *See* AR 5176 ("I questioned whether PlanetSpace could successfully manage much larger subcontractors responsible for the majority of the performance under the contract.").  This is a fine, but important distinction.[27]  *See Capitol CREAG LLC*, B-294958.4, 2005 CPD ¶ 31, at *5 (Comp. Gen. Jan. 31, 2005) (distinguishing between agency finding that offeror lacked adequate management and staffing "which might well have been a responsibility concern" and finding that offeror's proposed management and staffing plan carried "a high risk of unacceptable performance").  A contractor's ability to perform the proposed contract goes to the contractor's "responsibility," and only "responsible" offerors are eligible for government contract awards.  *See* FAR 9.103(a); *supra* note 5.

---

[26] Pl.'s Mot. for J. at 35.

[27] This is a distinction that plaintiff's counsel at times ignores in the zealous pursuit of his client's claims.  For example, plaintiff's counsel asserts that the SSA's conclusion that plaintiff's *proposed use of an alternate launch vehicle* (i.e., the Atlas V) presented a risk of schedule delays, AR 5175, was a "classic" responsibility determination, Tr. 19.  Of course, identifying deficiencies contained within an offeror's proposal does not constitute a non-responsibility determination concerning the offeror itself.

Authority to evaluate the responsibility of a prospective contract-awardee lies with the procurement's contracting officer, not with the SSA. *See* FAR 9.103(b) ("No purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility."). In making this determination of responsibility or non-responsibility, the contracting officer considers, *inter alia*, whether the offeror: (1) has the requisite financial resources; (2) is able to comply with the proposed performance schedule; and (3) possesses the necessary organization, experience, and technical skills to perform the contract. *See* FAR 9.104-1(a), (b), (e). Generally speaking, the contracting officer makes such a determination regarding only those offerors in line for award, i.e., those offerors whom the SSA selects in his written decision. *See* JOHN CIBINIC, JR. & RALPH C. NASH, JR., FORMATION OF GOVERNMENT CONTRACTS 439 (3d ed. 1998) (citing FAR 9.105-1(b)).

If the SSA selects a small business as the presumptive contract-awardee, then special rules and considerations apply. "Congress passed the Small Business Act of 1953, 15 U.S.C. §§ 631–651, to 'aid, counsel, assist, and protect . . . the interests of small-business concerns in order to preserve free competitive enterprise [and] to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government . . . be placed with small-business enterprises.'" *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1256 (Fed. Cir. 2005) (quoting 15 U.S.C. § 631(a) (2000)). To those ends, the Small Business Act assigns the United States Small Business Administration ("SBA") ultimate authority to decide whether a small business is responsible. *See* 15 U.S.C. § 637(b)(7)(A). Accordingly, if a contracting officer determines that a small business' otherwise acceptable offer is to be rejected due to a finding of non-responsibility, then "the contracting officer shall refer the matter to the [SBA]." FAR 9.104-3(d)(1). The SBA then decides whether to issue a Certificate of Competency. *Id.* Should the SBA issue the Certificate of Competency, the small business is conclusively deemed responsible for the purposes of the procurement in question. *See* FAR 19.601(a)–(b).

Standing apart from the responsibility determination, however, procuring agencies may, in the context of a comparative evaluation of proposals, use traditional responsibility criteria, such as considering an offeror's financial resources and past performance. *See YRT Servs. Corp. v. United States*, 28 Fed. Cl. 366, 394–95 (1993) (citing *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 203 (D.C. Cir. 1984)). As the Comptroller General explained in *Zolon Tech, Inc.*:

> An agency may use traditional responsibility factors, such as personnel competencies and capabilities, as technical evaluation factors where . . . a comparative evaluation of those areas is to be performed. A comparative evaluation means that the competing proposals will be rated on a scale relative to each other rather than on a pass/fail basis.

B-299904.2, 2007 CPD ¶ 183, at *6 (Comp. Gen. Sept. 18, 2007) (internal citations omitted). However, where responsibility-type concerns preclude a comparative or trade-off analysis, a *de facto* non-responsibility determination has been made and, in the case of a small business, referral to the SBA is required. *See Capitol CREAG LLC*, 2005 CPD ¶ 31, at *5 n.6 ("Where . . . a finding that a small business offeror's proposal is unacceptable under a responsibility-type criterion precludes such a comparative or tradeoff analysis, it is tantamount to a nonresponsibility determination."). As such, the key inquiry for the court in this case is whether responsibility concerns so permeated the SSA's decision that it cannot be said that the SSA performed a proper trade-off analysis at all.

Here, the SSA stated: "I could not conduct a 'typical' trade-off analysis *since I believed there was a low likelihood PlanetSpace could successfully perform the contract*." AR 5181 (emphasis added). One possible interpretation of this sentence, indeed the interpretation plaintiff urges this court to adopt, Pl.'s Reply at 7–8, is that the SSA did not perform the required trade-off analysis due to concerns about plaintiff's "ability and capacity to perform all [of the] contract['s] requirements." *Centech Group, Inc.*, 554 F.3d at 1034 n.2. If plaintiff is correct, then the SSA has essentially usurped the contracting officer's and the SBA's authority by making a non-responsibility determination.[28]

Concerns about a *de facto* non-responsibility determination are heightened in this instance, due to the agency's mishandling of the pre-award survey of the offerors. A contracting officer may order such a survey, well in advance of the SSA's award decision, if "the information on hand or readily available to the contracting officer . . . is not sufficient" to make a responsibility determination. FAR 9.106-1(a). NASA's regulations explain that a pre-award survey is to be used only by the contracting officer and only when making his responsibility determination. NASA FAR Supplement ("NFS") 1809.106-1. Pre-award surveys "are not to be used to obtain information useful to proposal evaluation that does not directly relate to the responsibility determination." *Id.* "Information obtained during the survey [is to] be treated in strict confidence and divulged only to those Government representatives having a need to know." NFS 1809.106-70.

In this case, a member of NASA's pre-award survey team sent an email to the SSA with a draft of the final pre-award survey report attached. *See* AR 16683. The email explicitly invited the SSA to consider the attached draft when evaluating the offerors' proposals. *See id.* ("this draft will be current enough for you to get a feel for the performance risk of each of the potential providers"). [**one sentence redacted**]  In other words, the report concluded that plaintiff could not meet the responsibility standards laid out at FAR 9.104-1. *See* AR 2600–01 ([**one sentence redacted**]).

Thus, the court is faced with two competing interpretations of the SSA's source selection decision. The SSA may have conducted and documented a sufficient, albeit atypical, trade-off analysis, in light of the risks inherent in plaintiff's proposal and the high-risk, critical nature of the procurement. Alternatively, the SSA may not have performed a trade-off analysis at all, due to

---

[28] Defendant-intervenor Space-X argues that plaintiff is not entitled to relief under count (1) because plaintiff is not a small business under the SBA's "ostensible subcontractor" rule, 13 C.F.R. § 121.103(h)(4). *See* Space-X Resp. 24–29. However, this court is without jurisdiction to make an initial size determination regarding a self-certified small business offeror. *See White Hawk Group, Inc. v. United States*, No. 09-374, 2010 WL 725561, at *3 (Fed. Cl. Feb. 25, 2010) ("It is exclusively the function of the SBA to decide [size protests]."); *Int'l Mgmt. Servs., Inc. v. United States*, 80 Fed. Cl. 1, 6–7 (2007) ("Plaintiff's argument that Torres is not a small business lacks merit because neither the contracting officer nor the SBA has determined that Torres is not a small business, and this court lacks authority to entertain a size protest." (citation omitted)); *see also* 13 C.F.R. § 121.1002 ("The responsible [SBA] Government Contracting Area Director or designee makes all formal size determinations in response to either a size protest or a request for a formal size determination . . . .").

concerns about plaintiff's ability to perform the contract.  Cost-benefit analysis supports the former interpretation; NASA's mishandling of the pre-award survey supports the latter.

### 3. The SSA's Testimony at GAO

Intervenor-defendant Orbital urges this court to rely on the SSA's testimony at GAO to provide further explanation.  *See* Orbital's Reply at 10 n.2 ("[I]t is entirely appropriate for this Court to look to and rely on the GAO testimony of selection officials in adjudicating this bid protest.").  Plaintiff argues otherwise, citing *Fort Carson Support Services v. United States*, 71 Fed. Cl. 571, 591–92 (2006).  Pl.'s Reply at 12 n.7, 14.

The court in *Fort Carson* held that the SSA's source selection decision is the "place to look" for the rationale supporting an agency's procurement decision.  71 Fed. Cl. at 592.  In *Fort Carson*, the plaintiff argued that the Army failed to adequately articulate the basis of its trade-off analysis in support of a contract award to plaintiff's competitor.  *Id.* at 591.  In support of its claim, plaintiff in *Fort Carson* quoted statements made by the *contracting officer* during a post-award debriefing.  *Id.*  The court refused to consider these statements, finding that the SSA's reasoning was sufficiently clear from the source selection decision.  *Id.* at 591–92.  Judge Wolksi stated that "while such debriefings might, on occasion, yield useful party admissions, any new explanations of the evaluation process made post-award are the sort of *post hoc* rationalizations that courts reject when offered by the government in bid protest cases."  *Id.* (internal quotations omitted).

Plaintiff's reliance on *Fort Carson* is misplaced, however.  There, the plaintiff sought to challenge the clearly articulated reasoning of the SSA's source selection decision by asking the court to consider the post-award statements of the contracting officer, not the SSA.  *Id.*  By contrast, here, intervenor-defendant Orbital seeks to clarify the SSA's otherwise ambiguous statements in the source selection decision by asking the court to consider the post-award testimony of the SSA himself.  Moreover, by rule, previous GAO testimony is properly part of the administrative record in a bid protest.  RCFC, App. C, ¶ 22(u).  Obviously, then, the court should accord GAO testimony some evidentiary weight.  Just as a court may look to extrinsic evidence of the parties' intent when attempting to interpret a patent ambiguity contained within a contract, *see, e.g.*, *Beta Sys., Inc. v. United States*, 838 F.3d 1179, 1183 (Fed. Cir. 1988), this court concludes that it may rely here on the SSA's GAO testimony to explain the patent ambiguity in his source selection decision.

Unfortunately, in this case, the SSA's GAO testimony further muddies the waters.  Consider the following exchange:

> Question: What is a "typical" trade-off analysis?
> SSA: I would say a formal trade-off analysis would a series of charts in the SEB that would delineate that exact specific trade-off.
> Question: What type of trade-off analysis was conducted in this case?
> SSA: Pretty much throughout today we discussed my selection thought process, my selection criteria.  We went over the charts and reviewed those.  And how we looked at all the analysis and the source selection statement, that reflects what analysis was done and what was presented.
> Question: So how is that different from a typical source selection trade-off analysis?

> SSA: I would say if I did a full-up trade-off analysis I would have a specific chart titled "trade-off analysis" and we would actually trade all the parameters directly and there would have been a presentation from the SEB with full supporting documentation to go do that. And what we did was we effectively discussed all that during the meeting, but we didn't have a formal dedicated discussion on trade-off analysis. And that's what the intent of this statement is to reflect.

AR 31228–29. To be fair, the court is certain that the SSA's testimony contains some transcription errors. However, the essence of what the SSA appears to be saying is that the difference between a "typical" trade-off analysis and the analysis he performed turns on how the SEB's charts were prepared and presented—a decidedly unilluminating answer for the court's purposes. When asked "[w]hy [he] couldn't . . . conduct a typical tradeoff analysis in this procurement," the SSA responded:

> We could have done a formal—there was no physical reason why. We just—again I would say that—I mean the statement pretty much stands for its weight. Since I believe there's a little likelihood or high risk to PlanetSpace, I didn't think we needed to go the extra step to do a formal trade-off analysis.

AR 31229. There again, the SSA's testimony fails to clarify the matter; indeed, he essentially repeated the questionable language from his written decision, but in a different order.

To his credit, the SSA did testify that he asked himself whether "the higher cost of Orbital's proposal was worth the apparent technical superiority of the proposal." *Id.* When pressed to reveal how much weight he assigned price in his trade-off analysis, the SSA simply stated that "[p]rice was a consideration." *Id.* However, the SSA further explained:

> I would say I didn't assign [price] a percentage. And again, that would go back to the statement in my source selection statement, if I would have done a typical trade-off analysis I would establish some weighting criteria, place that in, we would have discussed that, we would have established that, *et cetera*. I didn't go that far to establish a percentage of benefit to us for price considerations. It was understood. I saw it as an advantage. I didn't put any numerical score. I didn't put it in any value and I didn't do a formal trade-off analysis.

AR 31230. Finally, the court notes this exchange:

> Question: Your source selection statement says that you did not conduct a typical trade-off analysis. Does the document anywhere say that you did conduct any sort of trade-off analysis?
> SSA: It does not specifically say that. But if you read through the document you can infer and see what we traded and what we evaluated and how we evaluated it and how we traded it.
> Question: Does the document anywhere directly or impliedly say, express your view, that Orbital's technical advantage outweighed PlanetSpace's price advantage? Can you point to any language in the document which suggests that?

> SSA: I can't point to a specific paragraph. You need to read the document in total and then infer yourself for yourself if that's evident in reading the entire statement in itself.

*Id.* The SSA's inability to point to any *express* trade-off analysis contained within his decision is troubling. For the court to accept the SSA's invitation to *infer* such an analysis would risk substituting the court's judgment for that of the agency. *See Citizens to Pres. Overton Park*, 401 U.S. at 416.

### 4. Remand to the Agency for Further Explanation Is Proper

The court has considered the SSA's GAO testimony, has read the entire source selection statement and, with regard to the trade-off analysis, cannot determine what the SSA was attempting to convey. Given the ambiguity of the source selection statement, the court believes that a remand to the agency in this instance is proper. *See Fla. Power & Light Co.*, 470 U.S. at 744 ("[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." ). On remand, the court asks the SSA to provide a sworn statement, making explicit and unambiguous the trade-off analysis that he believed was implicit in his source selection decision. *See Tech. Sys., Inc. v. United States*, 50 Fed. Cl. 216, 220–21 (2001) (recounting earlier remand to agency for the purpose of allowing the contracting officer to issue the required trade-off analysis); *see also* RCFC 52.2(a) ("In any case within its jurisdiction, the court, on motion or on its own, may order the remand of appropriate matters to an administrative or executive body or official.").

## IV. CONCLUSION

For the above reasons, counts (3)–(6) are **DISMISSED** with prejudice. The court withholds judgment on counts (1) and (2) pending the further agency action outlined above. Proceedings in this case are **STAYED**. The agency shall provide the SSA's sworn statement to the court by May 3, 2010, unless good cause is shown as to why the agency cannot comply. Within seven days of the agency's filing, the parties shall file a joint status report proposing a procedural course-of-action for resolving the remaining portions of plaintiff's complaint. Because the court does not reach the merits of counts (1) and (2) in this opinion, it need not address plaintiff's motion for a permanent injunction at this time.

**IT IS SO ORDERED.**

s/ *Lawrence J. Block*

Lawrence J. Block
Judge